In the Matter of UNION FINANCIAL SERVICES GROUP, INC. Outsourcing Solutions Inc., RWC Consulting Group, LLC, Greystone Business Group, LLC, Coast to Coast Consulting, LLC, PAE Leasing, LLC, Pacific Software Consulting, LLC, University Accounting Service, LLC, North Shore Agency, Inc., OSI Portfolio Services, Inc., Perimeter Credit L.L.C., Gulf State Credit, L.L.C., OSI Support Services, Inc., OSI Collection Services, Inc., Jennifer Loomis & Associates, Inc., Asset Recovery & Management Corp., Grable, Greiner & Wolff, Inc., Indiana Mutual Credit Association, Inc., Qualink, Inc., Professional Recoveries Inc., Payco American International Corp., OSI Outsourcing Services International, Ltd., The Union Corporation, OSI Outsourcing Services, Inc., Transworld Systems Inc., American Recovery Company, Incorporated, C.S.N. Corp., General Connector Corporation, U.C.O.—M.B.A. Corporation, UCO Properties, Incorporated, Union–Specialty Steel Casting Corporation, Debtors.

Nos. 03–45870–399, 03–46323–399 to 03–46327–399, 03–46329–399 to 03–46350–399, 03–46352–399 to 03–46354–399.

United States Bankruptcy Court, E.D. Missouri, Eastern Division.

Oct. 15, 2003.

Eric R. Fencl, Chesterfield, MO, Evan R. Gartenlaub, Chicago, IL, Gregory D. Willard, Jennifer A. Merlo, Bryan Cave LLP, St. Louis, MO, Janet S. Baer, Ryan S. Nadick, Sven T. Nylen, Kirkland and Ellis, Chicago, IL, for Debtors.

Leonora S. Long, Office of U.S. Trustee, St. Louis, MO, for U.S. Trustee.

Adam H. Friedman, Frederick J. Levy, Michael S. Fox, Traub, Bonacquist and Fox, New York City, Daved L. Going, John Talbot Sant, Steven N. Cousins, Susan K. Olsen, Jr., Armstrong, Teasdale, et al., St. Louis, MO, Jack A. Hazan, Mitchell A. Seider, Paul Bradley O'Neill, Kramer, Levin, Naftalis & Frankel, LLP, New York City, for Official Committee of Unsecured Creditors.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING DEBTORS' AMENDED AND RESTATED JOINT PLAN OF REORGANIZATION, AS MODIFIED

BARRY S. SCHERMER, Bankruptcy Judge.

The Debtors[1] having proposed the Debtors' Third Amended Joint Plan of Reorganization, dated July 31, 2003 as modified on September 16, 2003, September 30, 2003, and by the Debtors' Amended And Restated Third Amended Joint Plan of Reorganization, as filed with the Court (collectively, the "Modifications") (the plan and the modifications and any subsequent modifications authorized in this Order, being collectively referred to herein as the "Plan"); the Court having entered an order (the "Disclosure Statement Order"), dated August 1, 2003, approving the Debtors' Amended Disclosure Statement in Connection with the Plan (the "Disclosure Statement") under Section 1125(b) of the Bankruptcy Code; the Court having considered the Plan, the Disclosure Statement, the Debtors' Memorandum of Law in Support of Confirmation of the Plan (the "Confirmation Memorandum"), and all objections and responses to confirmation; the Court having heard at the hearing on confirmation before the Court commencing on September 30, 2003 (the "Confirmation Hearing") the statements of counsel in support of and in opposition to confirmation of the Plan, the Court having considered all testimony presented and evidence admitted at the Confirmation Hearing; the Court having considered the credibility of

---

1. Unless otherwise specified, capitalized terms and phrases used herein have the meanings assigned to them in the Plan (as such term is defined below). In addition, in accordance with the Plan, any term used in the Plan or this Confirmation Order that is not defined in the Plan or this Confirmation Order, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules.

the witnesses and their sometimes conflicting testimony; the Court having considered the proceedings to date in the Reorganization Cases; and the Court finding that (a) notices of the Confirmation Hearing and the opportunity of any party in interest to object to Confirmation were fair, adequate and appropriate as to all parties to be affected by the Plan and the transactions contemplated thereby and (b) the legal and factual bases set forth in the Confirmation Memorandum and presented at the Confirmation Hearing establish just cause for the relief granted herein; the Court hereby makes the following Findings of Fact, Conclusions of Law and Order: [2]

## FINDINGS OF FACT

### Introduction

1. Union Financial Services Group, Inc., a subsidiary of Outsourcing Solutions Inc., filed its voluntary petition under Chapter 11 of the Bankruptcy Code on May 2, 2003. Outsourcing Solutions Inc., and its remaining 29 subsidiaries (collectively, with Union Financial Services Group, Inc., the "Debtors" or the "Company") filed their voluntary petitions on May 12, 2003. The Debtors have continued in possession of their properties and have operated and managed their businesses as debtors in possession pursuant to the provisions of Sections 1107 and 1108 of the Bankruptcy Code. *Keleghan Narrative*, Ex. B.1.; *Docket No. 1.*

### The Debtors' Business

2. The Debtors are, together, one of the largest providers of business process outsourcing receivables services in the United States with unaudited 2002 reve-

nues of approximately $596.4 million. *Keleghan Narrative*, Ex. B.5; *Weller Narrative*, Ex. B.3.

3. The Debtors' business generally is the collection of receivables for other parties, i.e., handling other people's money. *Keleghan Narrative*, ¶ 7. The Debtors provide receivables management services that allow clients to outsource management of the entire credit-to-cash cycle to achieve maximum recoveries at the lowest net cost. *Keleghan Narrative*, B.5; *Weller Affidavit*, Ex. B.3. *Calabrese Narrative*, ¶ 7. Most of the Debtors' third-party business is subject to immediate termination in the event a customer chooses to transfer its business. *Keleghan Narrative*, ¶ 7.

4. The Debtors have three principal lines of business:

(a) The outsourcing services business, which consists of accounts receivable management, billing, calling, and letter writing services for clients;

(b) The recovery (or collections) services business, which consists of a full range of contingent fee services provided to consumer creditors to collect past-due accounts; and

(c) The portfolio purchasing business (the "Portfolio Business"), which consists of purchasing portfolios of non-performing debt from creditor grantors. Portfolios are typically purchased at a deep discount from the aggregate principal values of the accounts. Once purchased, the Debtors use traditional collection techniques to obtain payment. *Keleghan Narrative*, ¶ 6 and Ex. B.5; *Weller Narrative*, Ex. B.3.

**2.** This Confirmation Order constitutes the Court's findings of fact and conclusions of law under Fed.R.Civ.P. 52, as made applicable by Bankruptcy Rules 9014 and 7052. Any and all findings of fact shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law shall constitute conclusions of law even if they are stated as findings of fact.

5. The Debtors' business is highly competitive. It is estimated that there are approximately 6,500 accounts receivable firms in the United States, with the 10 largest agencies accounting for less than 20% of industry revenues. *Keleghan Narrative,* ¶ 6 and Ex. B.5; *Weller Narrative,* Ex. B.3. Large-volume customers that outsource accounts receivables typically employ more than one accounts receivable management firm at a time so as not to allow excess concentration of accounts at any one firm. *Keleghan Narrative,* ¶ 6 and Ex. B.5; *Weller Narrative,* Ex. B.3.; *Calabrese Narrative,* ¶ 7.

6. Any interruption of the Debtors' services would have a severe impact on a customer's operations. Customer concerns about the potential inability of the Debtors to remit collected funds, due to bankruptcy or for other reasons, represent a serious threat to the Debtors' customer relationships. *Keleghan Narrative,* ¶ 7; *Calabrese Narrative,* ¶ 7.

7. The business is self-liquidating by nature, such that the Debtors' business declines if the customer does not continue to transfer receivables to the Debtors for handling. These business lines depend heavily on personal relationships which, if lost, are not easily recovered. *Keleghan Narrative,* ¶ 7.

8. The Debtors' Portfolio Business requires substantial available capital, as well as credibility in the marketplace, because sellers of portfolios can choose to whom they wish to sell, and buyers of portfolios can choose from whom they wish to buy. *Keleghan Narrative,* ¶ 8. Participants in the market want to do business with financially strong companies capable of standing behind the representations and warranties which can be associated with portfolio sale transactions. *Keleghan Narrative,* ¶ 8. Since participants in this market may potentially be liable for the actions of the buyer, trust and financial stability are also critical for this business sector. *Keleghan Narrative,* ¶ 8.

## Timely Emergence from Bankruptcy is Critical to the Debtors' Success

9. While the Debtors were able to maintain revenues from its three principal lines of business at or even slightly above budget until the Chapter 11 proceedings began, the drop-off since the Petition Date has been dramatic and sustained. *Weller Narrative,* ¶¶ 21–22; *Keleghan Narrative,* ¶ 36; *Debtors Ex. 127.*

10. Since the Chapter 11 proceedings began, the Debtors have also lost nearly 40 customers representing annual revenues of as much as $43 million. *Keleghan Narrative,* ¶ 43; *Weller Narrative,* ¶ 22; *Debtors Ex. 37, 136.* In addition, the Debtors have gained no new outsourcing business (the Debtors' largest and most strategically important business segment). *Weller Narrative,* ¶ 22.

11. As of the Petition Date, the Debtors employed approximately 6,500 employees. Since May 31, 2003, the Debtors have terminated 840 positions (including a number of "key" employees), and closed two locations. *Keleghan Narrative,* ¶ 21.

12. The Debtors' value has declined as a result of the Chapter 11 proceedings, and a continuation in Chapter 11 will likely lead to further deterioration of the Debtors' enterprise and value through the loss of customers and employees. *Keleghan Narrative,* ¶¶ 21, 43–44; *Weller Narrative,* ¶ 22; *Calabrese Narrative,* ¶ 24.

13. The Debtors' management's forecast on the effect of an additional 30 days in bankruptcy is that a loss of an additional $10 to $12 million in annual revenues will result. *Keleghan Narrative,* ¶ 44. Any delay and uncertainty creates additional instability and risks of loss of key people. *Keleghan Narrative,* ¶ 44.

**Events Leading to the Commencement of the Chapter 11 Cases (October 1998—December 2002)**

14. The Debtors' Portfolio Business depends upon having continuous access to a source of financing for portfolio purchases ("conduit financing"). *Keleghan Narrative,* Ex. B.8; *Weller Narrative,* Ex. B.6.

15. In October 1998, the Debtors, through a bankruptcy-remote entity, established a financing arrangement (the "Old Warehouse Facility") with an institutional financing source ("MBIA") to support its Portfolio Business. *Weller Narrative,* ¶ 12.

16. On December 10, 1999, the Company effected a recapitalization (the "Recapitalization"). *Weller Narrative,* Ex. B.11. As part of the Recapitalization, Madison Dearborn Capital Partners and its affiliates ("MDP") invested approximately $170 million in the Company and acquired approximately 70% of its outstanding common stock. *Weller Narrative,* Ex. B.11.

17. Under the terms of the Old Warehouse Facility, MBIA had discretion to refuse financing for any portfolio purchase sought. *Weller Narrative,* ¶ 13.

18. In 2000, shortly after consummation of the Recapitalization, the Company began searching for a supplemental financing vehicle to finance its Portfolio Business. *Weller Narrative,* ¶ 13.

19. During 2000 and 2001, the Company contacted and engaged in discussions with approximately 20 potential sources of supplemental portfolio financing. *Debtors' Ex.* 25. The Company was unsuccessful in obtaining any attractive offers. *Weller Narrative,* ¶ 13.

20. In August 2001, MBIA indicated to the Company that it would only continue to provide financing to the Old Warehouse Facility through October 2003. *Weller Narrative* ¶ 14. The Company obtained MBIA's permission to explore financing to replace (in whole or in part) or supplement the Old Warehouse Facility with a new facility. *Weller Narrative,* ¶ 15.

21. Over the next several months, the Company contacted a number of potential sources of financing for the Portfolio Business, including insurance companies, alternative finance companies and commercial banks. *Weller Narrative* ¶ 15. No suitable replacement for MBIA was found. *Weller Narrative,* ¶ 15 and Ex. B.20.

22. In December 2001, MBIA began refusing to finance additional portfolio purchases, effectively eliminating the Company's source for funding of the Portfolio Business and the Company's ability to buy portfolios. *Weller Narrative,* ¶ 18. The Portfolio Business was essentially shut down once MBIA ceased extending loans. *Keleghan Narrative,* ¶ 9.

23. In February 2002, during the 2001 year-end audit of the Company conducted by PriceWaterhouseCoopers, the Debtors' management discovered certain accounting discrepancies between the detailed account records and general ledger at one of the Company's subsidiaries, North Shore Agency, Inc. ("NSA"). *Weller Narrative,* ¶ 6 and Ex. B.12; *Wood Narrative,* Ex. B.2. After the Debtors' management was notified of the account discrepancies, the controller of NSA admitted that he had falsified records and inaccurately reported certain transactions. *Weller Narrative,* ¶ 6.

24. An independent investigation concluded that certain assets were intentionally overstated, while trade accounts payable were intentionally understated through falsification of records and inaccurate financial reporting over a two-year period. *Weller Narrative,* ¶ 7 and Ex. B.12; *Wood Narrative,* Ex. B.2. Certain NSA personnel no longer with the Debtors were in-

volved in the financial misreporting, and no current employees of the Debtors were involved. *Weller Narrative,* ¶¶ 7–8.

25. In April 2002, as a result of the accounting irregularities, the Company restated its financial statements for the year ended December 31, 2000, as well as the unaudited consolidated quarterly results for the quarter ended September 30, 2001. *Weller Narrative,* ¶ 9.

26. The cumulative effect of the NSA financial misreporting on the Debtors' balance sheet through December 31, 2001, was approximately $15 million. *Weller Narrative,* ¶ 9.

27. The restatement of the Debtors' financial results put the Debtors into default under the Old Warehouse Facility with MBIA. *Weller Narrative,* ¶ 10.

28. In early Spring 2002, in connection with a marketing call by Merrill Lynch on MDP, Merrill Lynch agreed to look into the opportunity of providing replacement portfolio financing to the Company. *Wood Narrative,* Ex. B.3.

29. During April and May 2002, Merrill Lynch gave initial indications of interest and conducted due diligence on the Company. *Wood Narrative,* Ex. B.3.

30. During the Spring and Summer of 2002, the Company also commenced efforts to sell its Portfolio Business and other selected Company businesses. *Weller Narrative,* Ex. B.20; *Wood Affidavit,* Ex. B.3. The Company contacted over 60 separate entities as part of these efforts. *Debtors' Ex. 140.* The Company ultimately sold the remaining portfolios held by the Portfolio Business for a gross purchase price of $62.5 million in October of 2002. *Weller Narrative,* Ex. B.20; *Wood Narrative,* Ex. B.3.

31. In June 2002, Merrill Lynch delivered a preliminary term sheet to provide replacement portfolio financing to the Company. *Wood Narrative,* Ex. B.3. Merrill Lynch subsequently declined to provide financing for the Company's Portfolio Business due to a variety of factors. *Wood Narrative,* Ex. B.3.

32. In August 2002, as a result of MDP's close relationship and historical business dealings with Merrill Lynch, MDP convinced Merrill Lynch to resume discussions and conduct due diligence to provide replacement portfolio financing to the Company. *Wood Narrative,* Ex. B.3. In the Fall of 2002, Merrill Lynch delivered another draft term sheet to provide replacement portfolio financing to the Company. *Wood Narrative,* Ex. B.3.

33. The declines in the Company's revenue and earnings from the loss of conduit financing and the problems caused by the restatement of its financial statements cumulatively contributed to impending defaults under the Company's credit agreement dated November 30, 1999, as amended (the "Existing Credit Agreement"), and under the indenture governing the Company's 11% senior subordinated note due 2006 (the "Subordinated Notes Indenture"). *Weller Narrative,* ¶ 10. As of the Petition Date, the Debtors were indebted to the Senior Secured Lenders under the Existing Credit Agreement in the amount of approximately $480 million. *Siffer Narrative,* ¶ 12; *Keleghan Narrative,* ¶ 12. *Final DIP Financing Order,* ¶ D. The Amounts borrowed by the Debtors under the Existing Credit Agreement are secured by valid, perfected, enforceable, first priority liens and security interests granted by the Debtors in favor of the Senior Secured Lenders upon and in substantially all of the Debtors' assets and property. *Final DIP Financing Order,* ¶ E.

34. In September 2002, the Company began a series of lengthy negotiations with

principal creditor constituencies to restructure its financial obligations. *Wood Narrative*, Ex. B.4.

35. Early in September 2002, the Company notified the agents under its Existing Credit Agreement (the "Managing Agents") of recent developments, including: (i) the departure of the Company's President and Chief Executive Officer, Timothy Beffa, in August 2002; (ii) the failure to obtain any attractive offers for the Portfolio Business; (iii) the loss of financing for the Portfolio Business; and (iv) the determination that it was likely not to be in compliance with certain covenants as of the end of the third quarter of 2002. *Wood Narrative*, Ex. B.4.

36. The Company also reported to the Managing Agents that it was working with a new institution as a possible source of financing for the Portfolio Business. *Wood Narrative*, Ex. B.4.

37. At the Managing Agents' request, in September 2002, the Company retained The Recovery Group ("TRG") to serve as restructuring advisors and to assist the Company in considering alternatives for addressing the impending covenant defaults. *Calabrese Narrative*, ¶ 8.

38. In late September 2002, the Company made a presentation to the entire group of lenders under its Existing Credit Agreement (the "Lenders"), describing the current situation and outlining a plan for addressing the impending defaults. *Wood Narrative*, Ex. B.4.

39. Shortly thereafter, the Company commenced discussions with the Senior Subordinated Noteholders. *Wood Narrative*, Ex. B.4. Certain of these holders formed a "Steering Committee" and retained the law firm of Kramer Levin Naftalis & Frankel LLP at the Company's expense. *Wood Narrative*, Ex. B.4.

40. Commencing in September 2002 (and continuing through February 2003), the Company implemented management reorganizations, personnel reassignments and reductions in its workforce and closed several of its office locations. *Weller Narrative*, Ex. B.22; *Wood Narrative*, Ex. B.4.

41. On October 3, the Managing Agents notified the Company that events of default had occurred under the Existing Credit Agreement as a result of, among other things, the Company's failure to comply with the financial covenants under the Existing Credit Agreement. *Weller Narrative*, Ex. B.24.

42. On October 15, the Company failed to, among other things, pay principal and interest due under the Existing Credit Agreement. *Weller. Narrative*, Ex. B.24

43. On October 29, the Company entered into a Forbearance Agreement and Sixth Amendment to the Existing Credit Agreement (collectively, the "Forbearance Agreement") with the Senior Secured Lenders to permit the Company's business operations to continue while discussions on a viable restructuring plan could proceed. *Weller Narrative*, Ex. B.24.

44. Pursuant to the Forbearance Agreement, the Lenders agreed to forbear from taking certain remedial action with respect to the defaults to provide stability while the parties explored possible restructuring alternatives. *Weller Narrative*, Ex. B.24.

45. On November 12, the Company made a presentation to the Lenders with respect to its business plan, a central feature of which was the need to obtain replacement financing for the Portfolio Business. *Wood Narrative*, Ex. B.4. It was clear that management regarded conduit financing as a key component of its business plan for the Portfolio Business in particular, and for achieving the highest

values for the overall Company. *Siffer Narrative*, ¶ 7.

46. In December 2002, the Company provided the Managing Agents with a revised business plan, which was based on obtaining financing for the Portfolio Business. *Weller Narrative*, Ex. B.22; *Keleghan Narrative*, Ex. B. 19; *Wood Narrative*, Ex. B.4.

47. Also in December 2002, the Company retained Kevin T. Keleghan to serve as the new President, Chief Executive Officer and Chief Restructuring Officer of the Company. *Weller Narrative*, Ex. B.22; *Keleghan Narrative*, Ex. B.19; *Wood Narrative*, Ex. B.4.

48. By the end of 2002, the Company was in a crisis position. Rumors, both in the marketplace and within the Company, were rampant that the Debtors would not survive. *Keleghan Narrative*, ¶ 9. Cash was extremely tight, and there were concerns about the Company's ability to meet payroll. *Keleghan Narrative*, ¶ 9. New business was almost impossible to obtain since customers knew that the Debtors were in default on its bank loans and they were waiting to see how the Debtors proposed to effect a rescue before entrusting the Company with additional receivables. *Keleghan Narrative*, ¶ 9.

49. The Debtors' inability to obtain acceptable financing for its Portfolio Business was a major factor in the financial decline of the Company. *Weller Narrative*, ¶ 16. Because the Company could not obtain acceptable financing for portfolio purchases, the Company experienced a material decline in revenues and operating earnings from the Portfolio Business from 2001 to 2002. *Weller Narrative*, ¶ 16. Historically, the Portfolio Business had been a very profitable business segment for the Debtors. *Weller Narrative*, ¶ 16.

50. As a result, the Company's adjusted operating earnings for the Company's Portfolio Business declined from $16.7 million for the year ended December 31, 2001, to a loss of $5.9 million for the year ended December 31, 2002. *Keleghan Narrative*, Ex. B.2; *Weller Narrative*, Ex. B.2.

### Development of the Restructuring Plan (December 2002—April 2003)

51. In December 2002, at the request of the Senior Lenders, the Company retained the investment banking services of Merrill Lynch to assist in considering strategic alternatives, and to provide a one-time valuation of the Company, assuming various scenarios. *Siffer Narrative*, ¶ 8. *Weller Narrative*, Ex. B.23; *Wood Narrative*, Ex. B.5.

52. In January 2003, Merrill Lynch delivered an analysis to the Company board of directors, and subsequently to the Managing Agents. The analysis indicated that the Company could maximize value for its stakeholders by obtaining replacement financing for the Portfolio Business, rather than selling the Company. *Siffer Narrative*, ¶ 9.

53. During this time, the Managing Agents and their counsel retained an independent financial advisor, FTI Consulting ("FTI"), to prepare its own valuations of the Debtors. *Siffer Narrative*, ¶ 10; *Nicastro Narrative*, ¶ 8. Based on its own forecasts and analyses, FTI independently concluded that Merrill Lynch's recommendation was reasonable. *Siffer Narrative*, ¶ 10; *Nicastro Narrative*, ¶ 8.

54. On January 9, 2003, Merrill Lynch executed a term sheet to provide a $90 million non-recourse portfolio purchasing facility to replace the Old Warehouse Facility (the "ML Conduit"). *Keleghan Narrative*, Ex. B.18.

55. From January through May 2003, Merrill Lynch and the Company negotiat-

ed the ML Conduit. *Keleghan Narrative* Ex. B.18.

56. On January 16, the Company and Managing Agents agreed to submit to Standard & Poor's ("S & P") for review and a tentative rating five alternative proposals in order to further the process of reaching agreement on a reorganization plan. *Weller Narrative*, Ex. B.22; *Keleghan Narrative*, Ex. B.19; *Wood Narrative*, Ex. B.4.

57. S & P did not ultimately provide a rating of any of the five alternative plans. However, the discussions with S & P indicated that the reorganized Company could not carry more than approximately $175 million in restructured indebtedness in order for the Debtors to reacquire a Select Servicer Rating ("SSR") from S & P. *Keleghan Narrative*, ¶ 23; *Siffer Narrative*, ¶ 11.

58. The SSR is the equivalent of the "good housekeeping" seal of approval in the Debtors' industry. *Keleghan Narrative*, ¶ 23; *Calabrese Narrative*, ¶ 11. The lack of an SSR had put the Debtors' at a competitive disadvantage in obtaining new business in products, such as asset-backed servicing ("ABS"), that are important to their future business and value. *Calabrese Narrative*, ¶ 11.

59. Based upon the forecasts and analyses provided to the Lenders, the Lenders concluded that there was no possibility of recovering the entire amount of secured debt, which was approximately $480 million. In order to facilitate a restructuring at the desired debt level, a significant majority of the Lenders came to the view that it would be necessary to write off a significant amount of the outstanding secured debt as part of the restructuring plan. *Siffer Narrative*, ¶ 12.

60. From February through April 2003, the Company, the Managing Agents and/or the steering committee of Senior Secured Lenders met on numerous occasions to negotiate the terms of a restructuring plan, which were based on a restructuring of the Debtors with Merrill Lynch providing the ML Conduit (facilitated by MDP), along with the Senior Secured Lenders' forgiveness of approximately $300 million in secured debt. *Keleghan Narrative*, Ex. B.19; *Wood Narrative*, Ex. B.4.

61. Following months of protracted, intense, arm's length negotiations, the Company, with the assistance of MDP, ultimately reached agreement with Lenders representing an aggregate of approximately 77% of the Senior Secured Lender Claims, and constituting approximately 70% by numerical count (the "Consenting Lenders") for a voluntary restructuring transaction (the "Restructuring Plan") through Chapter 11 of the Bankruptcy Code, whereby: (i) Senior Secured Lenders would receive 72.5% common stock equity in Newco, (ii) the Debtors' management would receive 7.5% common stock equity in Newco; (iii) MDP would contribute $10 million to Newco in exchange for receiving preferred stock convertible into 20% of the equity of Newco; (iv) Senior Secured Lenders would write down their secured debt of approximately $475 million to $175 million; and (v) Merrill Lynch would provide the ML Conduit facility to Newco in the amount of $90 million. *Keleghan Narrative*, ¶ 22; *Disclosure Statement*, pp. 54–56; *Plan Article III*; *Siffer Narrative*, ¶ 13. As part of the Restructuring Plan, the Company expected to re-obtain a "Select Servicer Rating" from S & P. *Id.* The ML Conduit was a vital component to the success of the Company's restructuring efforts and the viability of the Plan. But for MDP's participation in the Plan, Merrill Lynch would not make the ML Conduit available to the Company.

*Cary Testimony, Confirmation Hearing Transcript,* Vol. II, p. 251–52.

62. On April 30, 2003, the Consenting Lenders approved and executed a "Lock Up Agreement", outlining the principal terms of the restructuring plan and the reorganized Debtors' capital structure. *Keleghan Narrative,* ¶ 22 and Ex. B.19; *Weller Narrative,* Ex. B.22; *Wood Narrative,* Ex. B.4.

63. Under the Lock Up Agreement, the Consenting Lenders agreed to support and commit their vote in favor of the Restructuring Plan, subject to certain conditions, including but not limited to, the receipt of bankruptcy court approval of the Disclosure Statement, the effectiveness of the ML Conduit and the participation of MDP in the Restructuring Plan process. *Keleghan Narrative,* ¶ 63; *Debtors Ex. 1, Lock Up Agreement,* Section 2.

64. Under the Lock Up Agreement, the Lenders retained the ability to determine whether to "unlock" the agreement between the Lenders and MDP. The economic reality was that if the Lenders "unlocked" the Lock Up Agreement, they would lose the ability to access MDP's $10 million investment in Newco and would also lose the ML Conduit. In other words, the Lenders wanted a binding agreement with MDP, but also wanted to be able to unlock the MDP agreement and transition seamlessly into an improved, but equally binding arrangement with a superior bidder if one arose and presented a higher and better offer. *Siffer Narrative,* ¶ 16; *Debtors Ex. 1, Lock Up Agreement,* Section 2.

**The Solicitation and Review Process for Alternate Bids to Purchase the Company (April 2003—July 2003)**

65. The Lock Up Agreement was not an obstacle to testing the market to determine whether a better alternative than the Restructuring Plan might have been avail-able. *Keleghan Narrative,* ¶ 20. The Lock Up Agreement provided the Company with stability and permitted the Debtors to manage their customer relationships effectively during the bankruptcy process. *Keleghan Narrative,* ¶ 20. In fact, the Lock Up Agreement was advantageous to the Company. With the Lock Up Agreement, the Company could tell customers that it had firm deadlines and that it had a Restructuring Plan which was approved by its Lenders. This provided a "calming effect" on most of the Debtors' customers. *Keleghan Narrative,* ¶ 20.

66. The Company received several unsolicited non-binding offers or indications of interest from different investor groups to purchase either the Company, a portion of the Company or all of the bank debt. *Wood Narrative,* Ex. B.5; *Weller Narrative,* Ex. B.23.

67. On April 3, 2003, the Debtors received an unsolicited, detailed indication of interest from a group of investment funds (collectively referred to as "Bear Steams") with a stated valuation greater than that of prior offers or indications of interest. *Calabrese Narrative,* ¶ 13; *Weller Narrative,* Ex. B.23; *Wood Narrative,* Ex. B.5; *Debtors Ex. 43.*

68. The Managing Agents viewed Bear Stearns's offer as a credible indication of interest and were interested in pursuing this offer and the ML Conduit simultaneously, and pressured the Debtors to pursue Bear Stearns's offer. *Calabrese Narrative,* ¶ 13; *Wood Narrative,* Ex. B.5.

69. As a result, the Debtors decided to pursue the Bear Stearns offer at which time MDP withdrew its offer to purchase preferred stock from Newco. *Calabrese Narrative,* ¶ 13.

70. Throughout the negotiations of the ML Conduit and the Restructuring Plan, Merrill Lynch maintained that its provi-

sion of the ML Conduit was contingent upon, among other conditions, MDP's significant involvement as both a significant equity owner and leader of the reorganized Company and its reorganized subsidiaries at the board of directors level. *Wood Narrative*, ¶ 14 and Ex. B.5.; *Cary Testimony, Confirmation Hearing Transcript*, Volume II, pp. 251–52.

71. Upon the receipt of Bear Stearns's proposal, the Debtors' management requested that Merrill Lynch provide the ML Conduit without the involvement of MDP. *Wood Narrative*, Ex. B.5; *Keleghan Narrative*, Ex. B.20. Jonathan Cary of Merrill Lynch advised the Debtors that MDP's involvement was a precondition to Merrill's willingness to make the ML Conduit available. *Cary Testimony, Confirmation Hearing Transcript*, Volume II, pp. 251–52.

72. Also in April 2003, the Debtors contacted another party from which they had earlier obtained a preliminary term sheet to determine if the other party could develop an alternative to the ML Conduit. *Weller Narrative*, Ex. B.23; *Keleghan Narrative*, Ex. B.20; *Wood Narrative*, Ex. B.5. That party indicated that it would be willing to discuss a transaction, but on substantially less attractive terms. *Weller Narrative*, Ex. B.23; *Keleghan Narrative*, Ex. B.20; *Wood Narrative*, Ex. B.5.

73. In mid-April 2003, MDP (after receiving numerous requests from the Debtors and TRG because the Debtors could not receive a conduit on their own, and thus could not reasonably restructure) renewed its offer to invest in order to make it possible for the Debtors to obtain the ML Conduit and complete the Restructuring Plan. *Wood Affidavit*, ¶ 13 and Ex. B.5.

74. Mr. Keleghan, the Debtors' Chief Executive Officer, has also confirmed that MDP's continued sponsorship of the Debtors has material value to the Debtors'

estates in his ability to protect the Debtors' business and to maintain their employees. *Keleghan Testimony*, Vol. II, pp. 106–107.

75. The Debtors' senior management viewed the ML Conduit as indispensable for several reasons: (i) the ML Conduit represented a confirmation to the market that a prominent source of capital had confidence in the Debtors; (ii) the substantial sum of $90 million was to be immediately available; and (iii) the ML Conduit was not subject to any of the volatility that would exist if the Debtors were simply relying on cash flows generated from their own business. *Keleghan Narrative*, ¶ 40; *Wood Narrative*, ¶ 12. Management did not believe that the Company could maintain a successful Portfolio Business without a significant source of financing such as the ML Conduit. *Keleghan Narrative*, ¶ 34; *Wood Narrative*, ¶ 12.

76. The details of MDP's renewed offer to purchase 20% of Newco's preferred equity were outlined in the Lock Up Agreement's Summary of Process and Procedure (the "Summary"). *Debtors Ex. 33*.

77. The Summary also outlined the provisions by which the Debtors' board would solicit alternative bids for the Company or a portion of the Company. *Debtors Ex. 33*. The purpose of the Summary's process and procedure was to ensure that "higher and better" restructuring proposals, other than that set forth in the Restructuring Plan, were explored. *Wood Narrative*, Ex. B.5. Consequently, the Debtors were required to explore alternatives to the Restructuring Plan. *Siffer Narrative*, ¶ 14.

78. The Summary provided for an alternative bidding process, rather than an auction, because an open auction would have had a negative impact on the Company, given the characteristics of the Debt-

ors' industry. *Keleghan Narrative,* ¶ 36; *Resnick Narrative,* ¶ 39. An open auction would have highlighted the Debtors' distressed financial condition, announced to customers and employees that there was no way to predict the future, and displayed that there was no likely stability in the Debtors' ongoing business operations. *Keleghan Narrative,* ¶ 36. The significant risk of customer loss would have most likely resulted in reducing the value of the Company and in a lower recovery for stakeholders. *Keleghan Narrative,* ¶ 36; *Siffer Narrative,* ¶ 16; *Calabrese Narrative,* ¶ 15; *Resnick Narrative,* ¶ 39.

79. The Summary provided that the Debtors' board would appoint one or more new directors to a newly-constituted Sales Process and Procedures Committee (the "Special Committee"), to which the Debtors' board would delegate all of its duties in connection with the due diligence and bidding procedures for potential Alternative Transactions (defined below). *Debtors Ex. 33.*

80. The Summary provided that in the event that the Consenting Lenders terminated the Lock Up Agreement to pursue an Alternative Transaction, the Company would, upon the occurrence of any "Liquidity Event," pay MDP and Merrill Lynch a fee equal to $6 million (the "Break Up Fee").[3] *Debtors Ex. 33.*

81. To effectuate such process and bidding procedures, the Summary also provided that the Special Committee would vest TRG with the authority and responsibility of overseeing and implementing the due diligence and bidding procedures in connection with a potential Alternative Transaction. *Calabrese narrative,* ¶ 14; *Debtors Ex. 33.*

82. The Summary provided that the Debtors would immediately, upon the execution of confidentiality agreements, permit "Investor Groups" to commence due diligence reviews, pursuant to a review process designed by the Special Committee. *Debtors Ex. 33.* This due diligence period would run for no longer than three weeks from the date such Investor Group signed a confidentiality agreement. *Calabrese Narrative,* ¶ 17; *Debtors Ex. 33.*

83. At the conclusion of the due diligence period, any Investor Group interested in pursuing an Alternative Transaction was required to deliver its bid. *Debtors Ex. 33.* The Summary provided that after the Effective Date of the Lock Up Agreement, the Debtors would not be required to commence the due diligence process with any Investor Group that did not, in good faith, deliver (or had not previously delivered) a "Qualifying Bid." *Debtors Ex. 33.* The Summary defined a "Qualifying Bid" as a bid for a transaction that would provide a net value to the Debtors' estates of at least $250, million plus $6 million in cash to cover the Break Up Fee. This $250 million figure was not a valuation, but instead meant to simply be the "threshold" amount above which the Lenders were allowed to consider "unlocking" the MDP offer. *Debtors Ex. 33; Calabrese Testimony, Confirmation Hearing Transcript,* Volume III, pp. __. The bidder was required to be a third party investor financially capable of consummating the Alternative Transaction. A bid meeting these criteria was to be considered a "Binding Offer." *Debtors Ex. 33; Calabrese Testimony, Confirmation Hearing Transcript,* Volume III, pp. __. The Summary defined an "Alternative Transaction" as an alternative plan of reorganization or similar trans-

---

3. According to the Summary, a "Liquidity Event" means (i) the consummation of any Alternative Transaction(s), or (ii) the forfei-

ture of any deposit submitted in connection with any Binding Offer.

action, including, without limitation, a transaction under Sections 363 and 365 of the Bankruptcy Code, whether through a sale of capital stock, or assets, a merger, consolidation or other business combination or any similar transaction. *Debtors Ex. 33; Calabrese Testimony, Confirmation Hearing Transcript,* Volume III, pp. ___. The Summary provided for the Restructuring Transactions to remain subject to the submission of Binding Offers by "Qualified Investors" for an Alternative Transaction during the period of the Effective Date of the Lock Up Agreement to the date that was the earlier of (i) the date that is 45 days after the Commencement Date and (ii) the date that the Bankruptcy Court enters an order approving the Disclosure Statement. *Debtors Ex. 33; Calabrese Testimony, Confirmation Hearing Transcript,* Volume III, pp. ___.

84. Because the Company voluntarily filed its Chapter 11 petitions on May 12, 2003 (the "Commencement Date"), the deadline for submission of bids was June 26, 2003. *Debtors Ex. 33; Calabrese Testimony, Confirmation Hearing Transcript,* Volume III, pp. ___.

85. The Summary provided that to the extent that the Consenting Lenders were presented with a Binding Offer constituting a "higher and better" valuation than the Restructuring Plan, the Consenting Lenders had the right to terminate the Lock Up Agreement upon the affirmative vote of at least two-thirds in amount of the claims held by the Consenting Lenders. *Debtors Ex. 33.* The Summary provided that the determination of whether the value of a Binding Offer is "higher and better" than the value of the Restructuring Plan would be determined jointly by the Special Committee and TRG, on the one hand, and FTI (as designee of the Managing Agents on behalf of the Consenting Lenders) on the other hand. *Debtors' Ex.*

*33.* If there was a disagreement between the Special Committee and TRG and FTI, the Summary provided that the Debtors were to retain a nationally recognized investment banking firm mutually satisfactory to the Debtors and the Managing Agents to opine whether an Alternative Transaction constituted a "higher and better" offer than the Restructuring Transactions. *Debtors Ex. 33.*

86. In April 2003, the Debtors' board conducted a search process for new, independent directors to serve on the Special Committee. *Keleghan Narrative,* Ex. B.20; *Wood Narrative,* Ex. B.5.

87. On April 28, the Company entered into a confidentiality agreement with Lightyear Capital ("Lightyear"). *Morgan Narrative,* Ex. B.1.

88. On April 29, the Debtors' board elected two new, independent directors (Mark M. Morgan and Thomas J. Minich) to the newly-formed Special Committee. *Keleghan Narrative,* Ex. B.20; *Wood Affidavit,* Ex. B.4; *Morgan Narrative,* ¶ 6.

89. Some time thereafter, Tom Minich resigned and was replaced by Ray Weber. *Morgan Narrative,* ¶ 6; *Weber Narrative,* ¶ 6.

90. On April 30, the Debtors expanded the engagement agreement with TRG so that TRG would provide business advice and consultation to the Debtors during the process of negotiating terms for the restructuring. *Calabrese Narrative,* ¶ 14. This also called for TRG to assist the Debtors in evaluating proposed bids for the Company under the Summary, as noted above. *Morgan Narrative,* ¶ 8; *Calabrese Narrative,* ¶ 14.

91. On May 1, the Debtors entered into a confidentiality agreement with Bear Stearns. *Morgan Narrative,* Ex. B.1.

92. During the week of May 5, 2003, both Bear Stearns and Lightyear com-

menced due diligence with the Debtors' management presentations and trips to the Debtors' data room. *Morgan Narrative, Ex. B.1.*

93. On May 9, Merrill Lynch executed transaction documents for the ML Conduit. *Keleghan Narrative, Ex. B.18.*

94. On May 13, the Special Committee appointed Johnson & Colmar as legal counsel to the Special Committee. *Morgan Narrative, ¶ 7.*

95. On May 21, the Debtors entered into a confidentiality agreement with Ares Management and MidOcean Capital ("Ares/MidOcean"). *Morgan Narrative, Ex. B.1.*

96. During the week of May 26, Ares/MidOcean commenced due diligence with the Debtors' management presentations and with on-site visits to the Debtors' data room. *Morgan Narrative, Ex. B.1.*

97. On May 30, Lightyear submitted an offer with respect to an alternative plan for reorganization and acquisition of the Company. *Morgan Narrative, Ex. B.1.*

98. On June 2, the Debtors entered into a confidentiality agreement with JLL Partners ("JLL"). *Morgan Narrative, Ex. B.1.*

99. On June 7, the Special Committee indicated to Lightyear that its bid was not a Binding Offer, and that, even if it were a Binding Offer, it was not a Qualifying Bid having a higher and better value to the Debtors' Estates. *Morgan Narrative, Ex. B.1.* The Special Committee encouraged Lightyear to improve its proposal and offered to facilitate additional due diligence if that would be helpful to Lightyear in submitting an improved offer. *Morgan Narrative, Ex. B.1.*

100. On June 13, Bear Stearns submitted a proposal. On the same day, the Special Committee responded to Bear

Stearns that its bid was not a Qualifying Bid having a higher and better value to the Debtors' Estates. *Morgan Narrative, Ex. B.1.* The Special Committee encouraged Bear Stearns to improve its proposal and offered to facilitate additional due diligence. *Morgan Narrative, Ex. B.1.*

101. During June 2003, the Special Committee received inquiries from six other potential bidders or bidder groups. *Morgan Narrative, Ex. B.1.* Each of these potential bidders participated in varying degrees in the alternate sale process. *Morgan Narrative, Ex. B.1.*

102. The Special Committee's due diligence procedures provided potential bidders with requested information while protecting the Debtors' valuable customer data and confidential information in a fair and reasonable manner. *Weber Narrative, ¶ 3; Calabrese Narrative, ¶ 17.* The Special Committee provided all interested parties with a detailed bid procedures letter to assist them in the due diligence process. *Morgan Narrative, ¶ 15.*

103. On June 19, the Special Committee sent letters to all of the bidder groups that had expressed an interest in the alternate sales process, reminding them that the last date on which the Lock Up Agreement remained subject to the submission of binding offers for an Alternate Transaction was June 26, 2003 and advising all potential bidders to submit their bids on or before that date. *Weber Narrative, ¶ 3; Morgan Narrative, Ex. B.1.*

104. On June 26, Lightyear and Bear Stearns both submitted new proposals, while Ares/ MidOcean and JLL submitted a joint proposal. *Weber Narrative, ¶ 3; Morgan Narrative, ¶ 16 and Ex. B.1; Debtors Ex. 39–41.*

105. Also on June 26, NCO Group (a publicly-traded competitor of the Debtors) submitted a proposal without signing a

confidentiality agreement or performing due diligence. *Weber Narrative,* ¶ 3; *Morgan Narrative,* ¶ 16,and Ex. B.1; *Debtors Ex. 42.*

106. From June 26 through July 7, 2003, the Special Committee and TRG evaluated the four proposals (one each from Lightyear and Bear Stearns, one proposal submitted jointly by Ares/ MidOcean and JLL, and one from competitor NCO Group). *Weber Narrative,* ¶ 3; *Morgan Narrative,* ¶ 16; *Calabrese Narrative,* ¶ 19. The Special Committee determined that none of the proposals constituted a Binding Offer that would give the Consenting Lenders the right to terminate the Lock Up Agreement. *Weber Narrative,* ¶ 3; *Morgan Narrative,* ¶ 16, and Ex. B.1; *Calabrese Narrative,* ¶ 19.

107. Even though none of the four proposals constituted a Binding Offer, the Special Committee requested TRG to value each of the proposals to determine whether, if each of them had been a Binding Offer, it would have constituted a "higher and better" valuation than the Restructuring Transactions.[4] *Calabrese Narrative,* ¶ 19.

108. TRG valued the Lightyear proposal at $255 million, the Bear Stearns proposal at $261 million, the joint Ares/ MidOcean and JLL proposal at $258 million, and the NCO Group proposal at $250 million. TRG concluded (and the Special Committee concurred) that none of the proposals would have constituted a "higher and better" valuation than the Restructuring

Transactions. *Calabrese Narrative,* ¶ 19; *Debtors Ex. 44.*

109. All four of these valuations used assumptions favorable to the bidder, and a more rigorous analysis with more realistic assumptions would likely have lowered the valuations. *Calabrese Narrative,* ¶ 19.

110. FTI also reviewed the proposals and concurred that none of the proposals was a Qualifying Bid. *Nicastro Narrative,* ¶¶ 13–14.

111. On July 7, 2003, the four bidders were notified of the Special Committee's decision that none of the proposals was a Binding Offer. *Weber Narrative,* ¶ 3; *Morgan Narrative,* Ex. B.1.

**The Additional Solicitation and Review Process for Alternate Bids to Purchase the Preferred Stock and Conduit Financing Package (July 2003—September 2003)**

112. On July 1, MDP notified the Debtors of its willingness to allow other parties to replace it as the purchaser of preferred stock convertible into 20% of the equity of Newco. *Weber Narrative,* ¶ 3; *Morgan Narrative,* ¶ 22 and Ex. B.1.

113. In correspondence filed with the Bankruptcy Court on July 8, MDP proposed that any qualified person or institution, including all holders of senior claims with respect to the Debtors, be permitted to participate in an extension of the bidding process until August 1. *Docket No. 384; Weber Narrative,* ¶ 3; *Morgan Narrative,* ¶ 22 and Ex. B.1.

---

4. For comparability purposes, TRG used a midpoint value of $320 million from the range of $310–$331 million for its valuation of the Restructuring Transactions as described in the Debtors' Disclosure Statement. Of this $320 million, $175 million was debt and $145 million was equity. Because the Lenders were entitled to 72.5% of the equity under the Plan, TRG valued the benefit to the Debtors' Estates under the Restructuring Transactions at $280 million ($175 million + (72.5%)($145 million)). In its separate valuation, the Special Committee used the high end of that range—$331 million—for the Restructuring Transactions. Therefore, the Special Committee valued the benefit to the Debtors' Estates under the Restructuring Transactions at $288.1 million ($175 million + (72.5%)($156 million)).

114. In this same correspondence, MDP offered to support an amendment to the Lock Up Agreement to authorize an alternative investor to replace this "Preferred Stock and Conduit Financing" package if a series of conditions were satisfied prior to the expiration of the extended non-exclusivity period (i.e., by August 1, 2003). *Docket No. 384.* These conditions included:

(a) The new investor had to make a Binding Offer for a complete replacement of both the preferred stock investment and the conduit components of the Preferred Stock and Conduit Financing package;

(b) The terms and conditions of the executed, definitive agreements with respect to each component of the package had to be higher and better than the terms of the MDP and Merrill Lynch Preferred Stock and Conduit Financing package (as defined in the Lock Up Agreement's Summary of Process and Procedure);

(c) The substitute Preferred Stock and Conduit Financing package had to be a component of a reorganization plan, all components of which were substantially the same as the Reorganization Plan;

(d) Except for supplanting MDP's and Merrill Lynch's right to make the Preferred Stock and Conduit Financing investments, conditions, rights and remedies included in the Debtors' Restructuring Transactions and Reorganization Plan could not be changed; and

(e) the Debtors and required Consenting Lenders had to approve an amendment to the Lock Up Agreement in accordance with the terms thereof to replace the Preferred Stock and Conduit Financing package with the substitute package and to add the new investor as a party thereto, treating the substitute package as an Alternate Transaction that terminated the original Lock Up Agreement.

115. After receiving MDP's July 1 correspondence, the Special Committee began a solicitation process for the Substitute Preferred Stock and Conduit Financing package. *Weber Narrative,* ¶ 3; *Morgan Narrative,* ¶¶ 22–23 and Ex. B.1.

116. On July 9, the Special Committee's role was expanded by the Debtors' board and extended through August 1, to oversee the process and marketing the Newco Preferred Stock and Conduit Financing opportunity, as well as to evaluate any other unsolicited offers for the Debtors' businesses. *Weber Narrative,* ¶ 3; *Morgan Narrative,* ¶ 22 and Ex. B.1.

117. On July 10, the Special Committee sent letters to the four bidders from which it had received proposals on June 26 for an Alternative Transaction, informing them of MDP's offer to permit Qualified Bidders to submit Binding Offers to provide a Substitute Preferred and Conduit Financing package, on terms and conditions that were higher and better than the terms and conditions of the Preferred Stock and Conduit Financing set forth in the Restructuring Proposal. *Weber Narrative,* ¶ 3; *Morgan Affidavit,* ¶ 23 and Ex. B.1.

118. On July 11, the Special Committee sent letters to all current known holders of Senior Claims, bondholders, and preferred stockholders announcing the opportunity to provide Substitute Preferred and Conduit Financing on terms higher and better than the current proposal. *Weber Narrative,* ¶ 3; *Morgan Affidavit,* ¶ 23 and Ex. B.1.

119. Also on July 11, the Special Committee sent the same letter to approximately 30 entities that the Debtors had

approached over the previous several years for conduit financing. *Weber Narrative,* ¶ 3; *Morgan Affidavit,* ¶ 23 and Ex. B.1.

120. During the week of July 11, the Special Committee communicated this opportunity to all parties that had expressed an interest in the alternate sale process as well. *Weber Narrative,* ¶ 3; *Morgan Affidavit,* ¶ 23 and Ex. B.1.

121. In all of these communications, the Special Committee explained that MDP's offer to support an amendment to the Lock Up Agreement authorizing a Substitute Preferred and Conduit Financing was subject to the conditions described above on or before August 1, 2003. *Morgan Affidavit,* ¶ 23 and Ex. B.1.

122. The time permitted for the submission of bids was reasonable and fair given the circumstances. *Resnick,* Vol. III, pg. 80. It was possible to secure a fully committed, documented conduit facility in "3 to 4 weeks." *Ruban Report, p. 9, DSC Ext. 50.*

123. On July 14, Delaware Street Capital Master Fund, L.P. ("DSC", a potential bidder that held a portion of the Senior Claims not subject to the Lock Up Agreement), contacted the Special Committee expressing interest in the Substitute Preferred and Conduit Financing. *Weber Narrative,* ¶ 3; *Morgan Narrative,* Ex. B.1.

124. On July 18, the Debtors executed a confidentiality agreement with DSC and provided a substantial amount of non-public information to DSC. *Weber Narrative,* ¶ 3; *Morgan Narrative,* Ex. B.1.

125. On July 21, July 25, and August 1, the Special Committee received letters from Lightyear expressing a proposal that included certain elements of a Substitute Preferred and Conduit Financing. *Weber Narrative,* ¶ 3; *Morgan Narrative,* Ex. B.1.

126. On July 23, DSC representatives visited the Debtors and received a presentation by the Debtors' senior management and interviewed other management personnel. *Weber Narrative,* ¶ 3; *Morgan Narrative,* Ex. B.1.

127. On July 25, the Special Committee announced that as a result of various marketing efforts, the Special Committee had received and responded to at least 17 requests for additional information. *Weber Narrative,* ¶ 3; *Morgan Narrative,* Ex. B.1.

128. On July 31, Ares/MidOcean submitted an offer for the Debtors' preferred stock portion of the package. In its proposal, Ares/MidOcean proposed that the conduit would be provided by Merrill Lynch or one of its affiliates. *Morgan Narrative,* ¶ 25; *Debtors Ex.* 46.

129. On August 1, DSC proposed a restructuring transaction rather than a bid for the Preferred Stock and Conduit Financing package. *Morgan Narrative,* ¶ 25; *Debtors Ex.* 47.

130. Also on August 1, Lightyear forwarded to the Debtors a letter from CDC Mortgage Capital ("CDC") announcing that CDC was prepared to provide a facility under substantially similar terms and conditions as the ML Conduit. *Debtors Ex. 49.*

131. Also on August 1, Parthenon Capital and Arrow Financial Services (Parthenon/Arrow) submitted a proposal for the Preferred Stock and Conduit Financing package. *Morgan Narrative,* ¶ 25; *Debtors Ex. 51.*

132. The Special Committee ultimately received four proposals (Lightyear, Parthenon, and Ares/MidOcean proposals for the Preferred Stock and Conduit Financing package and DSC's August 1, 2003

proposal for a restructuring transaction) to review. *Morgan Narrative,* ¶ 25.

133. On August 7, after reviewing the proposals, TRG sent a letter to the Special Committee announcing its conclusion that none of the four proposals met the requirements of MDP's offer to support an amendment to the Lock Up Agreement because none of the four proposals constituted a Binding Offer. *Calabrese Narrative,* ¶ 21; *Debtors Ex. 45.*

134. The DSC proposal was rejected because this proposal, as noted above, included changes to the debt structure and included no preferred stock or conduit facility. Its significant changes to the terms and conditions of the Restructuring Transaction also caused it not to be in conformity with the terms of the MDP agreement to support an amendment to the Lock Up Agreement. In addition, the proposal stated that it was non-binding, meaning that it was not a valid Binding Offer. *Morgan Narrative,* ¶ 30; *Calabrese Narrative,* ¶ 20;.

135. Lightyear's proposal was not a Binding Offer because the proposal referenced a previous proposal that was subject to additional due diligence and involved the use of several professional firms at a cost to the Debtors of up to $500,000, thus indicating the non-binding nature of the proposal. The letter from CDC attached to Lightyear's proposal was not a commitment for a conduit financing facility. *Morgan Narrative,* ¶ 29; *Calabrese Narrative,* ¶ 21;.

136. The Ares/MidOcean proposal was rejected because of the reference to Merrill Lynch providing a conduit, when no evidence was provided that Merrill Lynch would provide such a conduit without the participation of MDP. The proposed change in the Break Up Fee was not in conformity with the terms of the MDP agreement to support an amendment to the Lock Up Agreement. *Morgan Narrative,* ¶ 28; *Calabrese Narrative,* ¶ 21.

137. The Parthenon/Arrow proposal was rejected because (like the DSC proposal) the proposal included significant changes to the terms and conditions of the Restructuring Transaction, causing it not to be in conformity with the terms of the MDP agreement to support an amendment to the Lock Up Agreement. *Morgan Narrative,* ¶ 31; *Calabrese Narrative,* ¶ 21. In addition, the proposal did not provide a term sheet for the conduit, making it impossible to assess the nature of the conduit. Finally, the proposal was non-binding until the completing of additional due diligence, meaning that it was not a valid Binding Offer. *Morgan Narrative,* ¶ 31; *Calabrese Narrative,* ¶ 21.

138. On August 8, FTI also sent a memo to the Special Committee concurring that none of the four proposals constituted a Binding Offer for a Substitute Preferred and Conduit Financing. *Nicastro Narrative,* ¶¶ 13–14.

139. Also on August 8, the Debtors' board extended the authority of the Special Committee to continue until the date of confirmation of a Plan of Reorganization. *Morgan Narrative,* ¶ 33.

140. On August 8, Parthenon/Arrow submitted a revised proposal which expired August 13. *Morgan Narrative,* ¶ 33. On August 14, Parthenon/Arrow submitted a revised proposal which expired August 20, 2003.

141. On August 20, the Special Committee responded to the Parthenon/Arrow August 8 and August 14 proposals, stating that on the basis of its review, the Special Committee was not in a position to recommend to the Debtors' board that it should seek an amendment to the Lock Up Agreement in order to further pursue the

Parthenon/Arrow proposal. *Morgan Narrative,* ¶ 36.

142. On August 23, DSC sent a letter to the Debtors revising its offer. *Morgan Narrative,* ¶ 36.

143. Until the date of the Confirmation Hearing, the Special Committee continued to receive and review any new bids (whether for the entire Company or for the Preferred Stock and Conduit Financing package) or any expression of interest from any potential bidder. *Morgan Narrative,* ¶ 37.

144. Since beginning the process and in an effort to explore all plausible restructuring alternatives, the Debtors engaged in discussions with well over 100 separate entities. *Debtors' Ex. 140.*

### ADDITIONAL FINDINGS OF FACT AS TO THE PLAN

145. Notice of the following was adequate and appropriate under the circumstances:

(a) The date set for the hearing on confirmation of the Plan;

(b) The last date and time to file and deliver objections to confirmation of the Plan;

(c) The last date and time for receipt of ballots;

(d) The last date and time to file and deliver objections and claims relating to the assumption, assumption and assignment or rejection of executory contracts and unexpired leases to be assumed or rejected under the Plan; and

(e) The Debtors' rejection of the executory contracts and unexpired leases designated for rejection in the Plan Supplement.

146. The Plan has a reasonable likelihood of success and is not likely to be followed by liquidation or the need for further financial reorganization. *Keleghan*

*Narrative,* ¶ 28. In particular, Newco, the Reorganized Subsidiaries, Union Trust, Union LLC, and Residual Union LLC will be solvent and adequately capitalized on the Effective Date. *Keleghan Narrative,* ¶ 28.

147. The Senior Secured Lenders participated actively in all phases of the negotiations preceding submission of the Plan, had economic interests contrary to those of the Debtors and MDP, were represented by experienced and competent legal and financial advisors, were led by a senior bank officer with 22 years of experience in banking and significant experience in the work-out and restructuring of troubled debt. The Senior Secured Lenders had no incentive to collude or concede anything to MDP if they did not conclude that such concessions would serve their interests by maximizing value to the estates. *Siffer Narrative.*

148. Pursuant to Sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, the Plan designates separate Classes of Claims and Interests, other than Administrative Expense Claims and Priority Tax Claims, each of which contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class. *Plan Article II.* In accordance with Section 1122(b) of the Bankruptcy Code, the Plan provides for a Class of allowed general unsecured Claims of $5,000 or less for each Debtor. *Plan Article II.D.5.a.* These Classes are reasonable and necessary for administrative convenience.

149. Pursuant to Section 1123(a)(2) of the Bankruptcy Code, the Plan specifies each Class of Claims or Interests that is not impaired under the Plan. *Plan Article II.*

150. Pursuant to Section 1123(a)(3) of the Bankruptcy Code, the Plan specifies the treatment of each Class of Claims or

Interests that is impaired under the Plan. *Plan Article II.* Each holder of Class 5A is entitled to be considered for designation as a Critical Business Claim and to be assigned a portion of the consideration that would otherwise be payable to the DIP Lenders and Senior Secured Lenders. *Plan Article II.D.5.a.; Plan Article I.A.31.*

151. Pursuant to Section 1123(a)(4) of the Bankruptcy Code, the Plan provides the same treatment for each Claim or Interest within a particular Class. *Plan Article II.D.*

152. Articles III and VII and various other provisions of the Plan provide adequate means for the Plan's implementation.

153. Section III.I.1 of the Plan provides that the Newco Charter and the certificate of incorporation or formation documents, as the case may be, of each of the Reorganized Subsidiaries shall be amended to satisfy the provisions of the Bankruptcy Code, including the requirements of Section 1123(a)(6) of the Bankruptcy Code. The Plan provides for an appropriate distribution of voting power among the classes of securities possessing voting power.

154. Section III.I.2 of the Plan provides that, pursuant to Sections 1129(a)(5)(A)(i), (ii) of the Bankruptcy Code, the initial directors and officers shall be appointed as provided in the Plan, which method is in a manner consistent with the interests of the holders of Claims and Interests and public policy.

155. The Plan provides for the assumption, assumption and assignment or rejection of the executory contracts and unexpired leases of the Debtors not previously assumed, assumed and assigned or rejected pursuant to Section 365 of the Bankruptcy Code and appropriate authorizing orders of the Court. *Plan Article VIII.*

156. As authorized by Section 1123(b)(3) of the Bankruptcy Code, Section IX.H of the Plan provides that, except as provided in the Plan, all causes of action recoverable under Chapter 5 of the Bankruptcy Code, all claims against third parties, and all other causes of action owed to or in favor of the Debtors, are preserved and retained for enforcement solely and exclusively by and in the entities designated in Section IX.H.

157. Article X.D.1 of the Plan provides for the release of a number of claims of the Debtors against various parties. The releases are based upon consideration by the Debtors and the Senior Secured Lenders of theoretical claims, including those investigated and raised by the Committee, and the legal and factual analyses for those claims. The probability of success of any such claim is highly problematic, uncertain and would necessarily require substantial costs, expenditures and delays. In addition, the releases are an integral element of the overall Plan. Most significantly, as evidenced by the extensive record in these Chapter 11 proceedings, the Official Unsecured Creditors' Committee performed an in-depth and wide ranging investigation (including numerous and extensive depositions and the production of hundreds of thousands of pages of documents) of causes of actions that might be available to the Debtors, including possible claims against the Released Parties (defined below). Based upon its independent investigation, the Committee asserted those claims in its objections to the Plan and in litigation that was filed against the Senior Secured Lenders in this Court. The Committee has resolved all of its objections to the Plan, including the Releases proposed in the Plan, and now fully supports and endorses the Plan. *Confirmation Hearing Transcript,* Vol I, pp. 15–18.

158. The lone remaining objector, DSC, has submitted no proof as to any even theoretical value of the claims being released.

159. There is no evidence that any person or entity being released by the estates committed wrongful acts that would justify a future claim.

160. Considering the probability of success in litigation; the difficulties to be encountered in the matter of collection; the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; the Committee's endorsement of the plan, including the releases, following the Committee's extensive independent investigation and consideration of possible claims, and the paramount interests of the Debtors and creditors and a proper deference to their reasonable views, the settlements and compromises embodied in the Plan, including Article X thereof, and implemented through this Confirmation Order and various releases and injunctions, including those in Sections X.B–G of the Plan, are fair, equitable, reasonable and in the best interests of the Debtors, and their respective estates and creditors. *Resnick Narrative*, ¶ 44; *Siffer Testimony, Confirmation Hearing Transcript*, Volume II, pp. ____; *Wood Testimony, Confirmation Hearing Transcript*, Volume II, pp. ____.

161. As noted, the Committee has announced its wholehearted and full support of confirmation of the Plan and has withdrawn all objections and dismissed all litigation (including resolving all objections and claims). *Confirmation Hearing Transcript*, Volume I, pp. 15–18. This support resulted from the good faith negotiations among the Debtors, the Committee, the Senior Secured Lenders and MDP. These negotiations led to a modification of the Plan at the start of the Confirmation Hearing to include a Pro Rata allocation among Classes 5A and 6A (excluding certain claims) of (i) 5% of Newco Common Stock; (ii) $500,000; and (iii) the exchange of corresponding mutual releases between and among the Debtors, Senior Secured Lenders, the Committee Members, EOS Partners, and MDP, and including, but not limited to, releases regarding and dismissal of pending lender liability and securities fraud litigation. The 5% of Newco Common Stock will be comprised of a 3½% reduction and a 1½% reduction in the Newco Common Stock otherwise to be received by the Senior Secured Lenders and MDP, respectively. *Confirmation Hearing Transcript*, Volume II, p. ___.

162. The Plan includes additional appropriate provisions that are not inconsistent with applicable provisions of the Bankruptcy Code, including: (i) the provisions of Article VIII of the Plan governing the assumption, assumption and assignment or rejection of executory contracts and unexpired leases; (ii) the provisions of Articles VI and VII of the Plan governing distributions on account of Allowed Claims, particularly as to the timing and calculation of amounts to be distributed; and (iii) the provisions of Article V of the Plan establishing procedures for resolving Disputed Claims and making distributions on account of such Disputed Claims once resolved.

163. Pursuant to the Disclosure Statement Order, the Debtors timely mailed or caused to be mailed, by first class mail, postage prepaid, to each creditor entitled to receive, a solicitation package containing, among other things:

(a) written notice of (i) the Court's approval of the Disclosure Statement, (ii) the time fixed for filing objections to and the hearing on, confirmation of the Plan, and (iii) related

matters described in the Disclosure Statement Order;

(b) the Plan;

(c) the Disclosure Statement (excluding unattached exhibits described in paragraph 8 of the Disclosure Statement Order);

(d) a solicitation letter from the Debtors;

(e) a letter from the committee; and

(f) a ballot and a ballot envelope (collectively, the "Full solicitation Package"). *Docket Nos. 920–928.*

164. Pursuant to the Disclosure Statement Order, the Debtors timely mailed to all creditors entitled to receive the following:

(a) notice that such Classes are unimpaired under the Plan;

(b) the name and address of the person from whom the Plan and the Disclosure Statement may be obtained;

(c) the time fixed for filing objections to, and the hearing on, confirmation of the Plan. *Docket Nos. 920–928.*

165. Pursuant to the Disclosure Statement Order, the Debtors timely mailed to all holders of interests classified in Classes 18, 19 and 20 the following:

(a) an abridged Disclosure Statement and a copy of the Plan (the "Summary Disclosure Statement"); and

(b) written notice of (i) the time fixed for filing objections to and the hearing on, confirmation of the Plan; (ii) the name and address of the person from whom the unabridged Disclosure Statement may be received; (iii) certain related matters (collectively, the "Summary Mailing"). *Docket Nos. 920–928.*

166. Pursuant to the Disclosure Statement Order, the Debtors also timely published the notice concerning the Confirmation Hearing in the following publications:

(a) The Wall Street Journal (National Edition); and

(b) St. Louis Post–Dispatch. *Docket No. 739.*

167. The Debtors proposed the Plan in good faith and not by any means forbidden by law. *Keleghan Testimony, Confirmation Hearing Transcript,* Volume II, pp. ____; *Weller Testimony, Confirmation Hearing Transcript,* Volume II, pp. ____; *Wood Testimony, Confirmation Hearing Transcript,* Volume II, pp. ____; *Resnick Narrative,* ¶ 42. In addition, there is no allegation or evidence that the Senior Secured Lenders or MDP acted in bad faith; in fact, those parties, while vigorously negotiating the underlying transactions consistent with their legal responsibilities, acted in good faith throughout the transactions. Consistent with the overriding purpose of Chapter 11, the Plan is designed to allow the Debtors to reorganize by providing them with a capital structure that will allow them to satisfy their pre-petition obligations with sufficient liquidity and capital resources to conduct their businesses. Moreover, the Plan itself, and the process leading to its formulation, provide additional and independent evidence of the Debtors' good faith.

168. The lone objector, DSC, has expressly acknowledged that the Senior Secured Lenders acted in good faith.

169. Pursuant to Standing Order No. 2 and Articles I.A.115 and II.B. of the Plan, Professionals or other entities requesting compensation or reimbursement of expenses for services rendered before the Effective Date shall file with the Court an application for final allowance of compensation and reimbursement of expenses, which the Court will review for reasonableness under Sections 328 and 330 of the Bankruptcy Code and any applicable case

law and for payment in accordance with the Final DIP Financing Order. Pursuant to Section 331 of the Bankruptcy Code and Standing Order # 2, the Court has authorized the monthly payment of certain of the fees and expenses of Professionals incurred in connection with the Reorganization Cases. All such fees and expenses, however, are subject to further review by the Court and further remain subject to final review by the Court for reasonableness and compliance with the Final DIP Order, the Bankruptcy Code and the Plan.

170. The Debtors have disclosed the identity and affiliations of proposed directors of the Reorganized Debtors, the manner in which the additional directors will be chosen and the identity and compensation of insiders who will be employed or retained by the Reorganized Debtors. *Docket No. 960.* The Debtors also have disclosed their officers. *Docket No. 960.* In general, the Debtors will retain current management post-Confirmation. *Keleghan Narrative,* Ex. B.16; *Docket No. 960.* The appointment or continuance of the proposed directors and officers is consistent with the interests of the holders of Claims and Interests and public policy.

171. The Debtors' businesses do not involve the establishment of rates over which any regulatory commission has or will have jurisdiction after Confirmation.

172. With respect to each impaired Class of Claims or Interests for each Debtor, each holder of a Claim or Interest in such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the applicable Debtor were liquidated on the Effective Date under Chapter 7 of the Bankruptcy Code. *Calabrese Narrative,* ¶ 10, Ex. B. 5–6.

173. As indicated in Article II of the Plan, Classes 2A, 4A, and 9A are unimpaired. The holders of Allowed Claims in Class 2B, if any, will receive on the Effective Date property of a value equal to the allowed amount of such Claim. Except with respect to Class 6A, all other impaired Classes of Claims that voted on the Plan have accepted the Plan, pursuant to Sections 1126(c) and (d) of the Bankruptcy Code.[5] *Docket No. 918.* Because the Plan provides that the holders of Allowed Claims and Interests in Classes 7A, 8A, 10A, 5B, 6B, 8B, 9B and 10B will not receive or retain any property on account of these Interests and because Class 6A has not voted to accept the Plan, these Classes are deemed not to have accepted the Plan pursuant to Section 1126(g) of the Bankruptcy Code.

174. The Plan provides for the treatment of Administrative Expense Claims, Priority Tax Claims and Claims entitled to priority pursuant to Section 507(a) of the Bankruptcy Code in the manner required by Section 1129(a)(9) of the Bankruptcy Code. *Plan Article II.B.*

175. All fees payable under 28 U.S.C. § 1930 shall be paid as soon as reasonably practicable following the Effective Date in cash equal to the amount of such fees. *Plan Article XII.A.*

176. From and after the Effective Date, the Reorganized Debtors will continue to provide for the payment of all retiree

---

5. As part of the resolution of the Committee's objections to the Plan, the Committee members, including its Chairman, EOS Partners, support and accept confirmation of the Plan. This would result in acceptance of the Plan by Class 6A. However, whether Class 6A accepted or rejected the Plan is not of consequence, as the Plan is confirmable under either scenario.

benefits (as such term is defined in Section 1114 of the Bankruptcy Code), if any. *Plan Article XIII.D.*

177. The Plan does not discriminate unfairly and is fair and equitable with respect to the holders of the Claims and Interests classified in Classes 5A, 6A, 7A, 8A, 10A, 5B, 6B, 8B, 9B and 10B.

178. With respect to holders of Claims against or Interests in Union, the Plan is fair and equitable. Article III.E. of the Plan provides that the existing Equity Securities and Interests in the Debtors and Union LLC will be cancelled and all related obligations discharged. *Plan Article III.C.5; Plan Article III.E.3.* Old OSI will receive no distribution on account of its equity Interest in Union or Union LLC, and no class junior to the dissenting classes will receive a distribution on account of their Claims and Indentures. *Plan Article III.E.3.*

179. Except as to the Senior Secured Lender claims, the modifications to the Plan do not adversely change the treatment of the Claim of any creditor or interest of any equity security holder. Both the Senior Secured Lenders and MDP have accepted the modifications. *Confirmation Hearing Transcript,* Volume I, pp. 17–18.

180. The objections of the holders of the Environmental Claims have been fully resolved by the modifications to the Plan and in accordance with the corresponding Term Sheet. *Debtors' Ex. 143.*

181. As a result of these compromises and settlements, the several objections of the holders of Environmental Claims have been withdrawn and those parties support confirmation of the Plan. *Confirmation Hearing Transcript,* Volume III, p. ——.

182. All other objections to confirmation, except the objections of DSC, have been resolved or withdrawn. *Id.; Confir-*

*mation Hearing Transcript,* Volume I, pp. 17.

183. Each of the conditions precedent to the entry of this Confirmation Order, as set forth in the Plan, has been or is reasonably expected to be satisfied prior to the Effective Date.

## CONCLUSIONS OF LAW

C1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334 and Local District Court Rule 9.01(b)(1).

C2. This Court upholds the admissibility of all 10 of the narrative direct testimonies with exhibits and other referenced documents, to the extent the Court has not previously sustained objections to specific portions thereof.

C3. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

C4. Each of the Debtors was and is qualified to be a debtor under Section 109(a) of the Bankruptcy Code.

C5. Venue in the Eastern District of Missouri was proper as of the Petition Date and continues to be proper under 28 U.S.C. § 1408.

C6. The Debtors have complied with all applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

C7. The specification of impairment and nonimpairment under the Plan complies with Section 1124 of the Bankruptcy Code.

C8. The notice provided by the Debtors of the Plan and any modifications to the Plan was adequate and appropriate under the circumstances.

C9. The modifications to the Plan comply in all respects with Section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019 and all other provisions of the Bankruptcy Code, including Sections 1122 and 1123,

and do not adversely change the treatment under the Plan of any Claims or Interests.

C10. In light of the nature and extent of the modifications to the Plan, no additional disclosure or solicitation under Section 1125 of the Bankruptcy Code is required with respect to the modifications.

C11. Pursuant to Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all holders of Claims and Interests that previously have accepted the Plan are deemed to have accepted the Plan, as amended by the modifications.

C12. Solicitation of acceptances of the Plan and the elections set forth in the Ballots by the Debtors comply with Sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rule 3018, the Disclosure Statement Order and all other applicable law.

C13. The Disclosure Statement, the Ballots and the Disclosure Statement Order comply with the provisions of the Bankruptcy Code and Bankruptcy Rules, including, but not limited to, Section 1125 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.

C14. Pursuant to Section 1125(e) of the Bankruptcy Code, the Debtors' transmittal of Plan solicitation packages, solicitation of acceptances of the Plan and participation in the issuance and distribution of any securities pursuant to the Plan shall not cause the Debtors to be liable, on account of such solicitation or participation, for violation of any applicable law, rule or regulation governing solicitation of acceptance of a plan of reorganization or the offer, issuance, sale, or purchase of securities.

C15. Pursuant to Section 1145(a)(1) of the Bankruptcy Code, the offering, issuance and distribution of any securities issuable pursuant to the Plan in respect of Claims or Interests shall be exempt from Section 5 of the Securities Act and any state or local law requiring registration prior to the offering, issuance, distribution or sale of securities.

C16. Pursuant to Section 1145(a)(2) of the Bankruptcy Code, the offering, issuance and distribution of Newco Common Stock shall be exempt from Section 5 of the Securities Act and any state or local law requiring registration prior to the offering, issuance, distribution or sale of securities.

C17. Pursuant to and to the fullest extent permitted under Section 1145 of the Bankruptcy Code, the resale of any securities issuable pursuant to the Plan in respect of Claims or Interests shall be exempt from Section 5 of the Securities Act and any state or local law requiring registration prior to the offering, issuance, distribution or sale of securities.

C18. Pursuant to Section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of any security under the Plan or the making or delivery of any instrument or transfer pursuant to, in implementation of, or as contemplated by the Plan or the revesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated by the Plan; the creation, modification, consolidation or recording of any mortgage, deed of trust or other security interest, the securing of additional indebtedness by such means or by other means or the additional securing of existing indebtedness by such means or by other means; the making, assignment or recording of any lease or sublease; or the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or govern-

mental assessment, and the appropriate state or local governmental officials or agents shall be, and hereby are, directed to accept for filing and recordation any of the foregoing instruments or other documents.

C19. The Plan complies with the applicable requirements of the Bankruptcy Code and Bankruptcy Rules, including Sections 1123 and 1129.

C20. In accordance with Section 1129(a)(2) the Debtors have complied with the applicable provisions of the Bankruptcy Code.

C21. As discussed further below, in accordance with Section 1129(a)(3), the Plan has been proposed in good faith and not by any means forbidden by law.

C22. In accordance with Section 1129(a)(4), any payment made or to be made by the Debtors and Newco for services or for costs and expenses in connection with these Chapter 11 cases and the Plan has been approved by or subject to the approval of the Bankruptcy Court as reasonable.

C23. The Debtors have disclosed all of the information required by Section 1129(a)(5), including the identity and affiliations of the individuals proposed to serve as directors and officers of Newco and the Reorganized Subsidiaries and the nature of compensation of those parties.

C24. Section 1129(a)(6) does not apply to the Debtors.

C25. With respect to Section 1129(a)(7), each impaired class of Claims or Interests will receive or retain under the Plan on account of such Claim or Interest property of a value as of the Effective Date that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under Chapter 7.

C26. With respect to each class of Claims and Interests, such class has accepted or is not impaired under the Plan.

C27. Class 3A has accepted the Plan in accordance with Section 1126(c) of the Bankruptcy Code. Accordingly, all holders of Claims in Class 3A, including the only remaining objector to the Plan, DSC, is bound by that vote and the acceptance of the Plan by Class 3A.

C28. The Plan provides that the holders of the types of Claims described in Section 1129(a)(9) will be treated in accordance with that Section and will receive the consideration required thereunder.

C29. At least one class of Claims that is impaired under the Plan has accepted the Plan, excluding insiders.

C30. Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of any of the Debtors, Newco, the Reorganized Subsidiaries, or the Union Trust.

C31. The Plan provides for the payment of all fees payable under Section 1930 of Title 28 on the Effective Date, as such fees may be determined by the Court at the Confirmation Hearing.

C32. The Plan provides for the continuation after the Effective Date of payment of all retiree benefits as required by Sections 1114 and 1129(a)(13) of the Bankruptcy Code.

C33. Provided the ML Conduit is consummated pursuant to the terms and conditions approved herein, the assets and liabilities of Portfolio Acquisitions, LLC, the special purpose entity formed for the sole purpose of acting as the borrower under the ML Conduit, shall be considered at all time to be legally separate from the assets and liabilities of Newco and the Reorganized Subsidiaries.

## Good Faith

C34. The Plan meets the requirement of Section 1129(a)(3) of the Bankruptcy Code that a plan be proposed "in good faith and not by any means forbidden by law."

■■■ C35. A plan is proposed in good faith "if there is a likelihood that the Plan will achieve a result consistent with the standards prescribed under the Plan." *Hanson v. First Bank of South Dakota,* 828 F.2d 1310, 1313 (8th Cir.1987). "Generally, a plan is proposed in good faith if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." *In re Leslie Fay Cos.,* 207 B.R. 764, 781 (Bankr. S.D.N.Y.1997) (*quoting In re Texaco, Inc.,* 84 B.R. 893, 907 (Bankr.S.D.N.Y.1988), appeal dismissed, 92 B.R. 38 (S.D.N.Y.1988) (internal quotations omitted)). The focus under Section 1129(a)(3) is on whether the proposal of a plan is consistent with the objectives of the Bankruptcy Code. *See In re Madison Hotel Assocs.,* 749 F.2d 410 (7th Cir.1984) ("the important point of inquiry is the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."); *In re PPI Enters. (U.S.), Inc.,* 228 B.R. 339, 347 (Bankr. D.Del.1998).

■■■ C36. The Debtors have met the obligation to propose a plan in good faith under the Bankruptcy Code. The Plan was proposed for the purpose of reorganizing the Debtors, preserving the value of the Debtors' estates, and distributing that value to the Debtors' creditors.

C37. Prior to proposing the Plan, the Debtors were assisted by their professional advisors in conducting extensive analyses of the various reorganization strategies available to them under the circumstances. The Debtors analyzed the relevant information and assessed their particular circumstances in agreeing to the restructuring embodied in the Plan.

C38. The treatment of each class under the Plan accomplishes the rehabilitative goals of Chapter 11 by restructuring the debt obligations of the Debtors and providing the means through which the Debtors will operate a viable business going forward. The Plan allows creditors to realize fair and reasonable recoveries under the circumstances.

C39. The Plan is the result of extensive arm's-length, good faith negotiations between the Debtors and the primary interested parties. Faced with the loss of a conduit financing facility for its Portfolio Business, the NSA accounting irregularities, and multiple defaults under its secured credit facility, the Debtors spent over two years attempting to find a solution to an increasingly deteriorating business. The Debtors negotiated in good faith with a number of parties, resulting in a Restructuring Plan acceptable to its existing secured lenders and other constituents. As a result of these arm's length negotiations, the Plan provides fair value for creditors.

■■■ C40. The Supreme Court has recognized that "[t]he fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources." *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 723, 760 (Bankr.S.D.N.Y.1992) (*quoting NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 528, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)). The Plan meets this primary objective underlying a Chapter 11 bankruptcy as well, by preserving approximately 6,500 jobs and realizing a prompt distribution of value to creditors. The Plan provides the Debtors with a sound, restructured balance sheet and the legal and financial mechanisms to

implement and effectuate prompt distributions to creditors.

C41. The Restructuring Plan requires continued participation of both pre-petition secured creditors and equity holders. Given the particular context of these Debtors, the pre-petition secured creditors and equity holders are the only parties that are able and willing to provide the best opportunity for the Debtors to survive. The Debtors, in evaluating all of their options, determined that this Plan provides it with the best chance at a fresh start.

C42. The various actions by the Debtors to explore possible restructuring alternatives are further indicia of the Debtors' good faith. The sales processes and alternative sales processes that were employed in connection with the Plan exposed the company and the proposed restructuring, including the Newco Preferred Stock and ML Conduit, to the market and ensured that full value was received by the Debtors and the other constituent groups. Notwithstanding the extensive marketing process, no party offered a superior restructuring proposal.

C43. The Debtors' Senior Secured Lenders are substantially undersecured. Thus, no other unsecured creditor would be entitled to a distribution under a liquidation scenario. The Senior Secured Lenders and MDP have acted in good faith in supporting the Plan. Nevertheless, the Plan provides substantial recoveries and distributions to the unsecured creditors. The Unsecured Creditors' Committee fully supports and endorses confirmation of the Plan. This is further evidence that the Plan has been proposed in good faith.

C44. A large number of general unsecured creditors will receive payment in full of their claims through assignment of cash collateral by the Senior Secured Lenders, who would otherwise be entitled to payment of all of that cash collateral. *Plan*

*Article III.O.; Article II.D.5.* Similar assignments of collateral by secured creditors have been approved by this Court and other courts. *See In re SPM Manufacturing Corp.,* 984 F.2d 1305 (1st Cir.1993); *In re Interco Incorporated,* Case Nos. 91–00442–BKC (Bankr.E.D., Mo. Order, June 29, 1992). Secured creditors are generally free to assign their collateral as they see fit. In this case, the Senior Secured Lenders are voluntarily providing a distribution to creditors who otherwise would receive nothing.

C45. The Debtors and the other plan proponents, including the Senior Secured Lenders and MDP, have met their good faith obligations under section 1129(a)(3) of the Bankruptcy Code.

### Confirmation Over Objecting Dissenting Classes

### A. General Requirements

C46. The Plan satisfies the requirements under Section 1129(b) of the Bankruptcy Code for confirmation of the Plan with respect to its acceptance by Classes 5A, 6A, 7A, 8A, 10A, 2B, 5B, 6B, 8B, 9B and 10B.

C47. Section 1129(b) of the Bankruptcy Code provides that a plan of reorganization may be confirmed where the plan has not been accepted by all impaired classes of claims or equity interests (known as "cramdown"). Section 1129(b) provides in pertinent part:

Notwithstanding section 510(a) of [the Bankruptcy Code], if all of the applicable requirements of [section 1129(a) of the Bankruptcy Code] other than [the requirement contained in section 1129(a)(8) ] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not dis-

criminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1). Therefore, a plan may be confirmed over the dissenting vote of an impaired class or classes of claims and interests so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes. The plan proponent bears the burden of proof by a preponderance of the evidence. *See In re Cellular Info. Sys., Inc.,* 171 B.R. 926, 937 (Bankr. S.D.N.Y.1994). The Debtors have satisfied confirmation of the Plan pursuant to section 1129(b) as to Classes 5A, 6A, 7A, 8A, 10A, 5B, 6B, 8B, 9B and 10B.

### B. The Plan Does Not Discriminate Unfairly

C48. Section 1129(b)(1) does not prohibit discrimination between classes, but rather prohibits only discrimination that is unfair. *See In re Apex Oil Co.,* 118 B.R. 683, 710–711 (Bankr.E.D.Mo. 1990); *See also In re 11,111, Inc.,* 117 B.R. 471, 478 (Bankr.D.Minn.1990). A plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if similar claims are treated differently without a reasonable basis for the disparate treatment. *See, e.g., In re Kennedy,* 158 B.R. 589, 599 (Bankr.D.N.J.1993); *In re Resorts Int'l Inc.,* 145 B.R. 412, 481 (Bankr.D.N.J.1990); *In re Buttonwood Partners, Ltd.,* 111 B.R. 57 (Bankr. S.D.N.Y.1990); *In re Future Energy Corp.,* 83 B.R. 470 (Bankr.S.D.Ohio 1988); *In re Johns–Manville Corp.,* 68 B.R. 618 (Bankr.S.D.N.Y.1986), aff'd in part, rev'd in part on other grounds, 78 B.R. 407 (S.D.N.Y.1987), aff'd sub nom *Kane v. Johns–Manville Corp.* 843 F.2d 636 (2d Cir.1988).

C49. There is no unfair discrimination if the classes are comprised of dissimilar claims or interests. *See, e.g., In re Johns–Manville Corp.,* 68 B.R. at 636. Likewise, there is no unfair discrimination if, taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment. *See, e.g., In re Buttonwood Partners, Ltd.,* 111 B.R. at 63; *In re Rivera Echevarria,* 129 B.R. 11, 13 (Bankr.D.P.R. 1991).

C50. Although the Plan provides for differing treatments among the Claims in Classes 5A, 5B, 6A and 6B, the treatment is not unfair. A four-part test applies when determining whether a Plan discriminates unfairly:

i) whether the discrimination has a reasonable basis;

ii) whether the debtor can carry out the plan without discrimination;

iii) whether the discrimination proposed is in good faith; and

iv) whether the degree of discrimination is directly related to the basis or rationale for the discrimination, i.e., does the basis for discrimination demand that this degree of differential treatment be imposed.

*In re Apex Oil,* 118 B.R. at 711 (*citing In re Wolff,* 22 B.R. 510, 512 (9th Cir. BAP 1982)); *See also Internet Navigator Inc.,* 289 B.R. 128 (Bankr.N.D.Iowa 2003).

C51. This Plan does not "discriminate unfairly" with respect to the unsecured Claims that voted to reject the Plan, as Article II.D.5. of the Plan provides:

[W]ithin 30 days after the Effective Date from consideration otherwise due to the DIP Lenders and Senior Secured Lenders as a result of their Class 1A and Class 3A Claims, (i) Critical Business Claims shall be paid in full, without

interest, from and by Cash that, but for its voluntary assignment hereunder by the DIP Lenders and Senior Secured Lenders to and for the sole benefit of the assignees designated pursuant to the Plan, would otherwise be required to be paid to the DIP Lenders and Senior Secured Lenders, subject to an aggregate cap of $4,600,000, plus the amount necessary to satisfy Allowed Utilities Claims, which is also subject to an aggregate cap of $2,800,000, and (ii) De Minimis Claims shall be paid in full without interest, subject to an aggregate cap of $2,000,000, or, if the Claims exceed the caps described in clauses (i) or (ii), an amount approved by the Majority Consenting Lenders.

Article III.O. of the Plan provides as follows:

The Senior Secured Lenders and DIP Lenders have agreed to contribute to Newco a portion of the DIP Funds to pay Holders of certain Allowed Critical Business Claims, Allowed Utilities Claims and Allowed De Minimis Claims in Class 5A, in accordance with the terms of this Plan and the Summary Term Sheet. The DIP Funds represent assets and distributions, in which the Debtors have no right, title or interest, pursuant to the Forbearance Agreement, and, which would otherwise be required by applicable law to be paid directly to the Senior Secured Lenders and the DIP Lenders. Accordingly, within 30 days after the Effective Date, Holders of those certain Critical Business Claims, Utilities Claims and De Minimis Claims in Class 5A shall be paid directly from the DIP Funds, in accordance with Article II from and by Cash that, but for its voluntary assignment hereunder by the DIP Lenders and Senior Secured Lenders to and for the sole benefit of the assignees designated pursuant to the Plan, would otherwise be

required to be paid to the DIP Lenders and Senior Secured Lenders.

Under the terms of the Plan, all unsecured creditors are eligible for consideration of a possible assignment of cash collateral payments from the Senior Secured Lenders; that eligibility is uniform, it is wholly non-discriminatory. The Debtors have estimated that the Senior Secured Lenders will designate for cash collateral assignment approximately (i) 1,604 De Minimis Claims in the amount of $1,059,000, (ii) 249 Critical Business Claims in the amount of $4,394,000, and (iii) 21 Allowed Utilities Claims in the amount of $1,897,000.

C52. Within 30 days after the Effective Date, Critical Business Claims, Allowed Utilities Claims and De Minimis Claims will be paid in full, from cash collateral otherwise payable to the Senior Secured Lenders.

C53. The First Circuit in *In re SPM Manufacturing Corp.*, 984 F.2d 1305 (1st Cir.1993), approved the assignment and "carve out" by a secured creditor from proceeds of its collateral into a fund to pay general unsecured creditors. In *SPM*, as here, the debtor's assets were worth substantially less than the value of the secured creditor's blanket liens. *Id.* at 1307. In *In re Genesis Health Ventures*, 266 B.R. 591 (Bankr.D.Del.2001), the court followed *SPM* and recognized that creditors are "generally free to do whatever they wish with the bankruptcy dividends they receive, including to share them with other creditors." 266 B.R. at 602. This Court has approved similar assignments of collateral by senior secured lenders. *See In re Interco Inc.*, Ch. 11 Case Nos. 91–00442–BKC–JJB (Bankr.E.D., Mo. Order, June 29, 1992).

C54. The payment of Critical Business Claims, Allowed Utilities Claims and De Minimis Claims will be made from funds

that are earmarked and assigned by the Senior Secured Lenders and DIP Lenders as a voluntary assignment of their cash collateral. *Plan Article III.O.* The terms and conditions, including any required releases, for the payments by the Senior Secured Lenders to the particular recipients of the cash collateral assignments shall be a matter of separate negotiation and contract between and among the Senior Secured Lenders and those parties. There is no unfair discrimination in a Plan provision that allows the Senior Secured Lenders and the DIP Lenders voluntarily to assign to unsecured creditors cash collateral proceeds that otherwise would rightfully belong to the secured creditors, particularly in the context of a reorganization where continued relations with those unsecured creditors are important to future business of the reorganized Debtors.

## C. *The Plan Is Fair and Equitable*

C55. Section 1129(b) of the Bankruptcy Code provides that a plan is "fair and equitable" with respect to a class of unsecured claims or a class of interests that will not receive full payment under the plan if (i) no class senior is paid more than in full and (ii) no class junior will receive or retain any interest in property under the Plan. *See* 11 U.S.C. §§ 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii). *See also Bank of America National Trust & Savings Assoc. v. 203 North LaSalle Street Partnership,* 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999); *Northwest Village L.P. v. Franke (In re Westpointe L.P.),* 234 B.R. 431 (E.D.Mo.1999); *In re MCorp Fin. Inc.,* 137 B.R. 219, 235 (Bankr.S.D.Tex. 1992). The second of these requirements is commonly known as the "absolute priority rule."

C56. The first prong of the "fair and equitable" test has not been contested and has been met under the Plan.

C57. Under the Plan, no distribution will be made to Classes 7A, 8A, 10A, 5B, 6B, 8B, 9B and 10B, and the Claims in Classes 3A and 3B will not be paid in full. *See* 11 U.S.C. § 1129(b). With respect to those Classes that will not receive a distribution under the Plan, the Plan complies with the requirements of Sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii). With respect to Classes 5B, 6B, 8B, 9B and 10B, the Plan meets the requirements of Sections 1129(b)(2)(B)(ii) because no holder of a claim or interest junior to these Classes will receive or retain any property on account of such claim or interest.

## D. Absolute Priority Rule

C58. The absolute priority rule generally requires that no party in a class junior in priority may receive a distribution unless all classes senior to such party are paid in full. Therefore, equity holders of a debtor generally may not retain an interest in the reorganized entity on account of their prepetition interest in the debtor, unless all creditors and other interests above them in priority are paid in full. In the present case, MDP will receive an equity position in the reorganized Debtors; however, that interest is being received on account of the substantial "new value" that MDP is providing.

C59. An exception to the absolute priority rule exists where the junior creditor or interest holder contributes sufficient "new value" to the debtor's estate in exchange for the interest it retains or receives. The Supreme Court has recognized that an old equity holder may obtain an interest in the reorganized debtor, so long as it does not acquire such interest without "competition and without benefit of market valuation..." *203 North LaSalle Street,* 526 U.S. at 458, 119 S.Ct. 1411. In other words, provided that the new contribution that old equity provides for the

consideration that it is to receive under a Plan is subjected to a reasonable "market test" of the value of that consideration, the new value exception to the absolute priority rule is satisfied.

C60. To test the price contribution by old equity for the consideration to be secured by old equity, either (i) the exclusive period for a debtor to file a plan of reorganization must be terminated; or (ii) the consideration that the old equity holder will receive must be offered or exposed to a market test to ensure that the old equity holder is providing fair value for that consideration. The Supreme Court did not define precisely how that market test was to be determined. *See id.* at 458, 119 S.Ct. 1411 (indicating that the old equity holder's contribution should be tested by "some form of market valuation").

C61. Under the Plan, MDP will contribute (i) $10 million in cash to Newco, and (ii) arrange for Newco to receive the vital ML Conduit; in exchange for MDP's receipt of the Newco Preferred Stock.

C62. The views of experts in financing as to the value provided by MDP's securing and facilitating the ML Conduit differed at the Confirmation Hearing. The Court finds that the views of Mr. David Resnick, who is the head of restructuring at Rothschild & Co. and is extremely experienced and well-qualified in the area of corporate financial restructuring and has personally been engaged in over 50 significant restructurings and bankruptcies, is entitled to substantial weight. *Resnick,* ¶ 6. Mr. Resnick concluded that MDP offered significant value to the Debtors in the form of providing access to a conduit which would not otherwise be available, and in providing the estates with financial and management counseling, support and participation. Mr. Resnick also concluded that MDP's continued relationship with the Debtors' estates provides immediate and current financial value to the estates inasmuch as this is a materially significant factor in persuading customers that the Debtors have continued viability.

C63. The evidence was undisputed that the ML Conduit would not be available to the Debtors without MDP's continued active involvement and participation. Merrill Lynch's relationship partner, Jonathan Cary, so testified. Mr. Cary had contemporaneously confirmed this fact to many individuals involved in the restructuring negotiations, including Mr. Wood of MDP, Mr. Keleghan of the Debtors (who spoke to Mr. Cary at the request of the Senior Secured Lenders), and Mr. Morgan of the Special Committee. The terms of the ML Conduit confirm that Merrill Lynch required continued equity participation by MDP. The Court finds this ML Conduit offers significant value to the Debtors' estates, reasonably estimated at enhancing enterprise value by approximately $100 million.

C64. The Court rejects the contention that such a conduit is readily available and is of no particular value. The absence of any fully financed and binding conduit proposal by any other party during the more than two years such a facility was being sought after by not only the Debtors and MDP, but also by the 35 members of the Senior Secured Lenders, confirms that the ML Conduit is a precious asset, not readily available, and in the current circumstances of this particular Chapter 11 proceeding has value of significant magnitude.

C65. MDP's role in providing the ML Conduit is not the equivalent of a mere guarantee. It is not a promise to take a future action that may or may not occur. MDP has procured the ML Conduit, and delivery of it at closing is a condition of the Plan.

C66. MDP's role in providing the ML Conduit and participation in the affairs of the Debtors is not the equivalent of "sweat equity" as maintained by DSC. MDP's contribution is concrete, objectively unique, and enhances value to the Debtors' estates in a manner that has been reasonably measured by the difference between enterprise value with and without the ML Conduit.

C67. Through the Special Committee and its advisors the Debtors simultaneously carried out two separate solicitations for the equity of the Debtors. The first involved a solicitation for the sale of the entire OSI business enterprise. The second solicitation involved the preferred stock and conduit package offered by MDP. The marketing efforts were carried out by the Special Committee in accordance with the Lock Up Agreement and related documents.

C68. The process utilized by the Debtors in marketing the business enterprise and the MDP preferred stock and conduit package was a reasonable and fair market test. The Debtors and MDP began testing the market for possible alternative transactions for more than two years prior to the filing of this Chapter 11 proceeding, including exploring possible transactions with over 100 firms during that time period in respect to all plausible alternatives to bankruptcy. The methodologies and processes used in the marketing and alternative sales processes were specifically designed to test the market for both of those items, while protecting the Debtors' business and enterprise value. These processes were appropriate and adequate under the circumstances to test the market for both the enterprise value and the MDP package. An auction or other method of marketing the company (*e.g.*, a Section 363 sales process or auction, sealed bids or otherwise) would not have been appropriate under the circumstances. In fact,

those alternatives likely would have had significant negative effects on the value of the Debtors' businesses and assets. Notably, even DSC did not challenge the inappropriateness of a broader marketing and open auction process. These conclusions were additionally validated though testimony of Mr. David Resnick, of Rothschild Inc. Mr. Resnick is highly qualified and experienced in complex financial transactions and restructurings, including marketing and sales of distressed businesses, both within Chapter 11 and otherwise. His expert opinion testimony was clear and unequivocal—the process utilized in this matter was fair; it was appropriate; and it satisfied the requirement of *203 North LaSalle.*

C69. In addition, the lone objector—DSC—has stipulated that the alternative bid process was appropriately limited in its scope so as not to materially and adversely affect the Debtors' business and that an open auction M & A process would have been significantly detrimental to the Debtors' estates.

C70. DSC has also acknowledged that there was no need for a formal "book" (as would ordinarily be prepared by an investment banker) in connection with the alternative bid process.

C71. As described in detail above, independent directors managed the marketing process with the assistance of independent counsel and professional financial advisors. The Special Committee was flexible and accommodating to parties requesting information or otherwise wishing to participate in the process. The proposals and offers that were submitted to the Special Committee during the marketing process were not binding, superior offers to the restructuring plan embodied in the Plan, which includes the Newco Preferred Stock and conduit package. No higher or better offer was made for either the MDP "piece"

of the deal or the Debtors' entire enterprise. The Lock Up Agreement in place throughout the marketing and solicitation process did not adversely affect or otherwise hinder the marketing process. In fact, the process contemplated by the Lock Up Agreement exposed the proposed sale to the market and created a competitive bidding environment that operated to test the market, and, in particular, the consideration provided by MDP for the Newco Preferred Stock. The requirement that bidders provide conduit financing for the Portfolio Business as part of their bids for the Newco Preferred Stock was necessary. The Debtors need such financing in order to maximize the value of their business on an ongoing basis. Bids that did not include committed conduit financing would not have been appropriate under the circumstances.

C72. The timelines and deadlines imposed under the Lock Up Agreement and used in the marketing process were fair and necessary to ensure a timely restructuring by the Debtors and to ensure that there was an adequate market test of the restructuring and the elements of the restructuring.

C73. The Debtors have complied with the letter and spirit of *203 North LaSalle Street.* They offered an opportunity to submit competing bids for the Restructuring Plan as a "whole" as well as the right to bid for the MDP package. The marketing process sought bids from (i) parties previously expressing interests in acquiring the Debtors, (ii) companies providing financing and capital investments, (iii) existing lenders, and (iv) competitors. The marketing process included (i) establishing a data room, (ii) disseminating sales data, (iii) management presentations and follow-ups regarding specific due diligence concerns and (iv) flexibility in the due diligence process and timing for submission of offers. Bids that were received were reviewed by an independent Special Committee, TRG, financial advisors to the Debtors, and FTI, financial advisors to the Senior Secured Lenders. No bids constituted higher and better offers for the Debtors as a "whole," and no party offered to pay a "premium" over the price offered by MDP for the Newco Preferred Stock/ML Conduit.

C74. The Debtors solicited bids from alternative purchasers for the MDP participation in the Plan from 137 firms, including most of the country's leading equity, financial services and investment banking firms. DSC identified no plausible alternative bidder who was not contacted and solicited to submit a bid. The time permitted for the submission of bids was reasonable and fair given the circumstances. Thus, the market had a reasonable opportunity to outbid MDP.

C75. In summary, the appropriateness of any "market test" for the new value exception to the absolute priority rule must be evaluated on a case by case basis. The marketing process utilized by the Debtors with respect to the Debtors overall and the additional processes used to offer the MDP component of the Plan were more than sufficient to ensure that a true market test occurred in accordance with the requirements of *203 North LaSalle Street* as to both the business as a whole, and the Newco Preferred Stock/ML Conduit to be received as provided by MDP.

### *Feasibility*

C76. Section 1129(a)(11) of the Bankruptcy Code provides that a plan of reorganization may be confirmed if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor un-

der the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). This requirement encompasses two related, but independent determinations: (i) that the debtor is able to consummate the provisions of the plan and (ii) if consummated, the plan will enable the debtor to emerge from bankruptcy as a viable entity. *See In re Lakeside Global II, Ltd.,* 116 B.R. 499, 506 (Bankr. S.D.Tex.1989) ("This definition [of feasibility] has been slightly broadened and contemplates whether [ (i) ] the debtor can realistically carry out its plan, ... and [ (ii) ] whether the plan offers a reasonable prospect of success and is workable." (citation omitted)); *In re Rolling Green Country Club,* 26 B.R. 729, 734 (Bankr.D.Minn. 1982) ("The court assumes that the word 'confirmation' in [§ 1129(a)(11) ] contemplates ... execution or consummation of the plan, the real [intention] of the subsection being to avoid confirmation of plans which even if consummated are fruitless as an instrument to reorganization.").

 C77. The feasibility test requires the Court to determine whether the Plan is workable and has a reasonable likelihood of success. *See United States v. Energy Resources Co.,* 495 U.S. 545, 549, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990). The key element of feasibility is whether there exists a reasonable probability that the provisions of the Plan can be performed. *See In re Clarkson,* 767 F.2d 417, 420 (8th Cir.1985) ("The test is whether the things which are to be done after confirmation can be done as a practical matter.") (citation omitted).

 C78. The purpose of the feasibility test is to protect against visionary or speculative plans. As noted by the Ninth Circuit:

The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.

*Travelers Ins. Co. v. Pikes Peak Water Co. (In re Pikes Peak Water Co.),* 779 F.2d 1456, 1460 (10th Cir.1985) (*quoting Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.),* 761 F.2d 1374, 1382 (9th Cir.1985)).

 C79. The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds. *See In re Leslie Fay Cos.,* 207 B.R. at 789.

C80. The corporate structure changes and transactions and the new financing arrangements to be executed and completed as part of the Plan will allow the Debtors to continue as viable entities and to fulfill their obligations under the Plan. The Debtors have shown that they will be able to meet their obligations in respect of such changes and the Plan itself.

 C81. The Plan provides for a workable reorganization of the Debtors' businesses and capital structure that is based upon a realistic business plan. The requirements of Section 1129(a)(11) of the Bankruptcy Code are satisfied.

### *Releases*

C82. Article X.D.1 of the Plan provides for the release of claims against a number of persons and entities (collectively, the "Release Parties").

C83. The releases granted under the Plan to the Release Parties are an important component of the consideration "package" for the Senior Secured Lenders' agreement to substantially impair their Claims under the Plan, write down $300 million of debt, take a 69% equity interest in Newco and provide exit financing. The releases are also part of an integrated transaction between and among the Debt-

ors and their primary creditors. As such, they are part of the price of the deal, and the Restructuring Plan could not have been accomplished without such a provision.

C84. There is no evidence of malfeasance by any of the Release Parties, and the Debtors are not forsaking any known meritorious claims against the Release Parties. The costs of exploring further whether any purely speculative or unknown causes against such parties might exist greatly outweigh the benefit that has been achieved by the Debtors through the Restructuring Plan. Most notably, claims already investigated and asserted by the Committee against the Release Parties are being voluntarily dismissed, with prejudice, by the Committee as part of its support of the Plan. The Debtors need the Plan, and they could only achieve consummation of the Plan by including the releases.

C85. In effect, more value will inure to their estates by granting the releases and receiving the benefits of the Plan than pursuing any hypothetical or speculative causes of action against the Release Parties. *See In re Apex Oil*, 92 B.R. at 868.

C86. The Senior Secured Lenders considered the releases an integral part of the restructuring package. As they are the parties that stand to benefit from any valuable causes of action, the Senior Secured Lenders have no motivation to provide releases in the face of any actual misconduct by the Debtors' officers and directors.

C87. No party in interest has provided evidence that any worthwhile causes of action against any of the Release Parties exist.

C88. Releases such as those contained in Article X.D.1 of Debtors' Plan and under the circumstances of this Case, are customary and reasonable in large Chapter 11 cases.

C89. In furtherance of such releases, courts may permanently enjoin lawsuits against the Release Parties for the Claims (hypothetical or otherwise) that are being released, provided that the injunctions are an important part of the debtor's reorganization plan. Where the success of the reorganization is premised in substantial part on such releases, and failure to obtain releases means the loss of a critical financial contribution to the debtor's plan that is necessary to the plan's feasibility, such releases should be granted.

C90. In this case, the releases are necessary and appropriate given the circumstances of these cases. The Plan was negotiated at arm's length and in good faith. As a result of these negotiations, a financing and restructuring package was developed which provides a great benefit to the Debtors and their estates. As part of the price for this deal, and in order for the Plan to work, the specified releases are necessary.

C91. The release provisions contained in Article X.D.1 of the Plan comply with the requirements of the Bankruptcy Code.

Accordingly, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

O1. All objections and responses to, and statements and comments in opposition to, the Plan, other than those withdrawn prior to, or on the record at, the Confirmation Hearing, shall be, and hereby are overruled.

O2. The Plan and each of its provisions are confirmed.

O3. The terms of the Plan shall be binding upon each of the Debtors, their successors, Newco, the Reorganized Subsidiaries, Union Trust, any and all affected

persons, entities and governmental units, any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are impaired under the .Plan or whether the holders of such Claims or Interests accepted or are deemed to have accepted the Plan), any and all non-Debtor parties to executory contracts and unexpired leases with any of the Debtors and the respective heirs, executors, administrators, successors or assigns, if any, of any of the foregoing.

O4. Except as provided in the Plan, each Debtor shall continue to exist as of the Effective Date as a separate legal entity.

O5. The Debtors, Newco, the Reorganized Subsidiaries, Union Trust, CSFB who is authorized to act on behalf of the new Senior Secured Lenders, and all other parties are authorized to enter into, execute, deliver and implement the Agreements and other promissory notes, documents and instruments substantially consistent therewith and any amendments to such Agreements as therein provided, to prepare and attach all requisite schedules and exhibits to such Agreements, and to take such other steps and perform such other acts as may be necessary to implement and effectuate the Plan and/or the Agreements. The liens securing the New Obligations shall be effective without the necessity of filing UCC Financing Statements.

O6. Except as otherwise provided in the Plan, the agreements executed pursuant to the Plan or this Confirmation Order, on and after the Effective Date each Debtor may operate its businesses and may use, acquire and dispose of property and compromise or settle any Claims or Interests.

O7. On and after the Effective Date, any portfolio receivables and other assets sold or transferred to Portfolio Acquisi-

tions, LLC by Newco or any of the Reorganized Subsidiaries shall be deemed to be sold or transferred to Portfolio Acquisitions, LLC free and clear of any security interest, lien or encumbrance of any creditor of the Debtors, Newco or any of the Reorganized Subsidiaries, including, without limitation, any security interest, lien or encumbrance of the Senior Secured Lenders, so long as such sale or transfer is made in compliance with the terms and conditions of the ML Conduit.

O8. So long as the ML Conduit is consummated pursuant to the terms and conditions herein approved, Portfolio Acquisitions, LLC, the special purpose entity formed for the sole purpose of acting as the borrower under the ML Conduit, shall not be liable or responsible for any obligations, claims or other indebtedness of Newco or the Reorganized Subsidiaries, and the assets and liabilities of Portfolio Acquisitions, LLC shall be deemed factually and legally separate at all times from the assets and liabilities of Newco and the Reorganized Subsidiaries.

O9. Except as provided below, requests for payment of Administrative Expense Claims must be filed with the Bankruptcy Court and served on the Debtors no later than 60 days after the Effective Date. Holders of Administrative Expense Claims that are required to file with the Bankruptcy Court a request for the payment of such Claims and that do not file and serve a request by the applicable bar date shall be forever barred from asserting such Claims against the Debtors, the Reorganized Debtors or their respective property.

O10. Notwithstanding any provision to the contrary in Standing Order # 2, Professionals or other entities requesting compensation or reimbursement of expenses pursuant to Sections 327, 328, 330, 331,

503, 506 and 1103 of the Bankruptcy Code (including compensation or reimbursement requested pursuant to Section 503(b)(4) of the Bankruptcy Code by any Professional or other entity for making a substantial contribution in any Reorganization Case) shall file and serve on the Master Service List an application for final allowance of compensation and reimbursement of expenses no later than 60 days after the Effective Date; *provided, however,* that any Professional who receives compensation or reimbursement of expenses pursuant to Standing Order # 2 may continue to receive such compensation, including payment of any current or prior unpaid 20% hold-back amounts, and reimbursement of expenses for services rendered before the Effective Date, so long as those payments otherwise comply with Standing Order # 2 and the terms of the Final DIP Financing Order. Objections to applications of Professionals or other entities for compensation or reimbursement of expenses must be filed and served on the appropriate Reorganized Debtors and the requesting party in accordance with the terms of Standing Order # 2.

O11. Holders of Administrative Expense Claims based on liabilities incurred by a Debtor in the ordinary course of its business (including Administrative Expense Claims of governmental units for taxes) shall not be required to file or serve any request for payment of such Claims.

O12. The executory contract and unexpired lease provisions of the Plan and the distribution provisions of Article VIII of the Plan shall be, and hereby are, specifically approved.

O13. Pursuant to the Plan, Article VIII, all executory contracts and unexpired leases of the Non–Union Debtors not designated in the Plan Supplement for rejection shall be deemed assumed by the Debtors pursuant to Section 365 of the Bankruptcy Code as of the Effective Date (with the exception of the Existing Options (as defined in the Plan) which shall be deemed rejected as of the Effective Date), unless otherwise (i) expressly rejected pursuant to an order of this Court prior to the Confirmation Date, or (ii) subject to a pending motion for approval of the rejection of such contract or lease filed on or before the Confirmation Date. Such executory contracts and unexpired leases shall be assumed as they exist on the Confirmation Date, including any and all postpetition amendments or modifications thereto entered into by the Debtors and the respective counterparties. The entry of this Confirmation Order shall constitute an order approving such assumptions pursuant to Section 365 of the Bankruptcy Code, effective as of the Effective Date. Each executory contract and unexpired lease assumed pursuant to this Confirmation Order shall revest in and be fully enforceable by Newco or the applicable Reorganized Subsidiary in accordance with its terms, except as modified by agreement of the parties thereto, the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law. Any executory contract or unexpired lease that is assumed after the Effective Date as a result of a withdrawn motion for approval of rejection shall be deemed assumed as of the date of withdrawal of such motion for approval of rejection.

O14. Notwithstanding anything in this Confirmation Order to the contrary, the following executory contracts or unexpired leases shall not be deemed assumed as of the Effective Date: (i) any executory contract or unexpired lease that has been rejected pursuant to an order of the Bankruptcy Court entered before the Confirmation Date; (ii) any executory contract or unexpired lease as to which a motion for

approval of the rejection of such executory contract or unexpired lease has been Filed and has not been withdrawn or decided by a Final Order as of the Confirmation Date; (iii) any executory contract or unexpired lease designated in the Plan Supplement for rejection and (iv) any executory contract, unexpired lease, or other obligation of the Union Debtors.

O15. Within 30 days following the Confirmation Date, the Debtors shall serve a notice (the "Assumption Notice") upon all non-customer counterparties whose executory contracts and unexpired leases are assumed through the Plan. The Assumption Notice shall inform such counterparties of the assumption of the relevant contract or lease and the applicable cure amount to be paid on the Effective Date in respect of any defaults thereunder pursuant to Bankruptcy Code Section 365(b)(1). The counterparties to the assumed contracts and leases shall have 20 days from the service of the Assumption Notice to notify the Debtors of any objection to (i) the assumption of the relevant contract or lease, (ii) the proposed cure amount in respect thereof, or (iii) any other matter pertaining to the assumption of the lease, including the Debtors' ability to provide adequate assurance of future performance (within the meaning of Bankruptcy Code Section 365(b)(1)). Any such objection must be communicated in writing so as to be received by counsel for the Debtors, Bryan Cave LLP, 211 N. Broadway, Suite 3600—OSI, St. Louis, Missouri 63102, Attention: Gregory D. Willard, Esq., no later than 20 days after service of the Assumption Notice. If no objection to assumption is timely communicated to the Debtors, such assumption, including the relevant cure amount as set forth in the Assumption Notice, shall be final and binding for all purposes, and not subject to further review. Upon receipt of any timely filed objections, the Debtors shall promptly contact the relevant contract or lease counterparty to attempt to resolve such objection. If the parties are unable to resolve any such objection, the Debtors shall schedule a hearing before the Court for a final determination of any remaining issues with respect to the proposed assumption, including the applicable cure amount required pursuant to Bankruptcy Code Section 365(b)(1). The Debtors shall retain the right not to assume any contract or lease as to which consensual resolution of the proposed assumption, including any applicable cure amount, cannot be reached.

O16. All executory contracts and unexpired leases (i) of the Non–Union Debtors designated in the Plan Supplement for rejection and (ii) of the Union Debtors (other than those specifically assumed by the Debtors on or before the Effective Date), shall be deemed rejected by the Debtors as of the Confirmation Date. The Confirmation Order shall constitute an Order approving such rejections as of the Confirmation Date. If the rejection by a Debtor of an executory contract or unexpired lease pursuant Article VIII.C. of the Plan gives rise to a Claim by a counterparty to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors, their respective successors or their respective properties unless a proof of Claim is filed and served on the applicable Reorganized Debtor no later than 30 days after the Confirmation Date. Such Claims as are allowed in respect of the rejection of an executory contract or unexpired lease shall be treated as General Unsecured Claims under the Plan. The Debtors shall have the right to file an objection to any filed proof of Claim in accordance with Article V of the Plan.

O17. Except as otherwise expressly provided hereunder, all employment and severance policies and all compensation

and benefit plans, policies and programs of the Non–Union Debtors applicable to their employees, retirees and non-employee directors or members of the board of directors and the employees and retirees of their subsidiaries, including, without limitation, all indemnification obligations and programs, savings plans, retirement plans, deferred compensation plans, healthcare plans, disability plans, severance benefit plans, incentive plans and life, accidental death and dismemberment insurance plans, shall be treated as executory contracts under the Plan and on the Effective Date shall be assumed pursuant to the provisions of Sections 365 and 1123 of the Bankruptcy Code. All employment contracts assumed pursuant to this Confirmation Order shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change of control" or "sale of the business," as defined in the relevant employment contracts.

O18. All directors' and officers' liability insurance policies maintained by the Debtors are hereby assumed by the relevant Debtors. Entry of this Confirmation Order shall constitute approval of such assumptions pursuant to subsection 365(a) of the Bankruptcy Code. Newco, the Reorganized Subsidiaries and the Union Trust shall maintain for a period of not less than six years from the Effective Date, coverage for the individuals covered, as of the Petition Date, by such policies at levels and on terms no less favorable to such individuals than the terms and levels provided for under the policies existing on the Petition Date and assumed pursuant to the Plan. Solely with respect to directors and officers of any of the Debtors who served in any such capacity at any time on or after the Petition Date, the Debtors shall be deemed to assume, as of the Effective Date, their respective obligations to indemnify such individuals (and only such individuals) with respect to or based upon any act or omission taken or omitted on or before such Effective Date in any of such capacities, or for or on behalf of any Debtor, pursuant to and to the extent provided by the Debtors' respective articles of incorporation, certificates of formation, corporate charters, bylaws, operating agreements and similar governing documents, as in effect as of the Petition Date. Notwithstanding anything to the contrary contained herein, such assumed indemnity obligations shall not be discharged, impaired or otherwise modified by the confirmation of the Plan and shall be deemed and treated as executory contracts that have been assumed by the Debtors pursuant to this Plan, as to which no proof of Claim need be filed.

O19. Debtors shall have 90 days from the Effective Date to object to any proofs of claim filed by the Missouri Department of Revenue. If Debtors fail to object to any such claims within this time period, the claims will be deemed Allowed.

O20. As of or following the time at which the conditions to the occurrence of the Effective Date set forth in the Plan are satisfied or duly waived, pursuant to the appropriate provisions of applicable state business corporation laws and of the Bankruptcy Code, the Debtors shall be, and hereby are, authorized, as contemplated by the Plan, and in each case in accordance with applicable terms of the Plan, and this Confirmation Order, to amend and restate their Charter and by-laws.

O21. After the Effective Date, Newco and the Reorganized Subsidiaries may further amend and restate certificates of incorporation, articles of incorporation, bylaws or similar charter documents, including LLC and trust agreements, as permitted by said charter documents or applicable state law.

O22. Pursuant to Section 1142(b) of the Bankruptcy Code and appropriate provisions of applicable state business corporation laws, the appropriate Debtors, Newco and the Reorganized Subsidiaries shall be, and hereby are, authorized to effectuate the Plan, the transactions contemplated by the Plan and this Confirmation Order, and to take any proceedings or actions provided for or contemplated by the Plan or this Confirmation Order, all without further action by their respective directors or stockholders, and with like effect as if such actions had been taken by unanimous action of the respective directors and stockholders

O23. The President, any Executive Vice President, any Senior Vice President, and any Vice President and the Secretary or any Assistant Secretary of each Debtor, Newco or the Reorganized Subsidiaries (the "Responsible Officers") shall be, and hereby are, authorized to execute, deliver, file and have recorded the applicable charter documents, as the case may be, and to take such other actions on behalf of such entity as such person may determine to be required under appropriate provisions of applicable state business corporation laws or any other applicable law in connection with the filing of such documents and, without limiting the generality or effect of the foregoing, the Secretary or any Assistant Secretary of each such entity shall be, and hereby is, authorized to certify or attest to any of the foregoing actions. The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person so to act.

O24. Pursuant to Section 1142(b) of the Bankruptcy Code and appropriate provisions of applicable state business corporation laws, without further action by the Court or the stockholders or (except as otherwise provided herein) board of directors or similar body of Newco or the Reorganized Subsidiaries, and without limiting the power or authority of any of them following the Effective Date to take any and all such actions as may be permitted or required by applicable nonbankruptcy law, Newco and the Reorganized Subsidiaries shall be, and hereby are authorized to implement the New Management Equity Incentive Program.

O25. Without limiting the generality or effect of any of the foregoing paragraphs, and consistent with the Plan, Newco and the Reorganized Subsidiaries shall be, and hereby are, authorized to enter into or modify employment, retirement, severance, change-in-control, indemnification and other agreements with their active directors, officers and employees, and to implement or modify retirement income plans, welfare benefit plans and other plans for active employees and take any and all such other actions as may be necessary or appropriate to perform and effectuate such agreements and plans and otherwise make available the benefits contemplated by such agreements and plans. Nothing in this paragraph shall limit or impair the rights, powers or duties of the boards of directors or stockholders of Newco, the Reorganized Subsidiaries with respect to such matters.

O26. Pursuant to Section 1142(b) of the Bankruptcy Code and Section 303 of the Delaware General Corporation Law, the Debtors shall be, and hereby are, authorized and directed to execute, deliver, and perform their obligations under, the Newco Charter and Newco By–Laws, and to take all such other actions and execute, deliver, record and file all such other agreements, instruments and other documents as any of their Responsible Officers may determine are necessary or appropriate in connection with the issuance and distribution of the Newco Common Stock

and Newco Preferred Stock under the Plan (collectively, the "Documentation"), all without further action by their directors or stockholders, and with like effect as if such actions had been taken by unanimous action of the directors and stockholders of such Debtor or Newco. The Documentation shall be substantially in the respective forms thereof submitted to the Court prior to the Effective Date.

O27. Pursuant to Section 1142(b) of the Bankruptcy Code and Section 303 of the Delaware General Corporation Law, the Debtors shall be, and hereby are, authorized and directed to execute, deliver, and perform their obligations under, those Agreements described in the Plan and this Confirmation Order and to take all such other actions and execute, deliver, record and file all such other agreements, instruments and other documents as any of their Responsible Officers may determine are necessary or appropriate in connection with the consummation of the Plan.

O28. Distributions to holders of Claims shall be made in accordance with the provisions of the Plan.

O29. The approvals and authorizations specifically set forth in this Confirmation Order are nonexclusive and are not intended to limit the authority, under other applicable law, of any Debtor, Newco and Reorganized Subsidiary to take any and all actions necessary or appropriate to implement, effectuate and consummate the Plan, this Confirmation Order and the respective transactions contemplated thereby. Without limiting the generality or effect of any other provision of this Confirmation Order, the appropriate Debtors, Newco and the Reorganized Subsidiaries shall be, and hereby are, specifically authorized and empowered to take any and all such actions as any of their respective officers may determine are necessary or appropriate to implement, effectuate and consummate the Plan, this Confirmation Order and the transactions respectively contemplated thereby and hereby, all in accordance with the terms of the Plan, this Confirmation Order and otherwise applicable law.

O30. Each of the Responsible Officers of each Debtor, Newco, Reorganized Subsidiaries and Union Trust shall be, and hereby is, authorized to execute, deliver, file or record such contracts, instruments, releases, indentures, mortgages, deeds, assignments, leases or other agreements or documents and take such other actions as such officer, under otherwise applicable law, may determine are necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, this Confirmation Order and the transactions respectively contemplated thereby and hereby, and whether or not such actions or documents are specifically referred to in the Plan, the Plan Supplement, the Disclosure Statement, the Disclosure Statement Order, this Confirmation Order or the Exhibits to any of the foregoing, and the Secretary or any Assistant Secretary of each such entity shall be, and hereby is, authorized to certify or attest to any of the foregoing actions.

O31. Pursuant to Section 303 of the Delaware General Corporation Law or any other applicable state law, with respect to any of the actions described in the Plan or this Confirmation Order which would otherwise require the consent or approval of the directors or stockholders of any Debtor, Newco or Reorganized Subsidiary, this Confirmation Order shall constitute such consent or approval, and such actions shall be, and hereby are, deemed to have been taken by unanimous action of the directors and stockholders of the appropriate entity.

O32. The rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be and are in exchange for and in complete satisfaction,

discharge and release, as of the Effective Date, of all Claims, all Allowed Claims, all Disputed Claims, debts, liens, security interests and encumbrances and termination of all Interests that arose before Confirmation, including any interest accrued on Claims from and after the Petition Date.

O33. The Debtors shall be, and hereby are, discharged from all Claims, all Allowed Claims, Environmental Claims (including all future response costs), all Disputed Claims and any other debts, liabilities or obligations of whatever nature and type that arose before the Confirmation Date, including any Claim for interest accruing after the Petition Date and prior to the Effective Date, and all debts, liabilities or obligations of whatever nature and type of the kind, including those specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (i) a proof of Claim based on such debt is filed or deemed filed pursuant to Section 501 of the Bankruptcy Code; (ii) a Claim based on such debt is allowed pursuant to Section 502 of the Bankruptcy Code; or (iii) the holder of a Claim (whether an Allowed Claim or a Disputed Claims) based on such debt has accepted the Plan.

O34. Except as provided in the Plan, entry of this Confirmation Order shall be, and hereby is, deemed to terminate all Interests and other rights of equity security holders in each of the Debtors to the extent provided by the Plan.

O35. In accordance with the Article X.B. of the Plan and Section 1141(d)(1) of the Bankruptcy Code, as of the Confirmation Date, all non-Debtor entities, persons, governmental units and individuals shall be, and hereby are, permanently enjoined and precluded from asserting against the Debtors, Newco, the Reorganized Subsidiaries, their respective successors or their respective property, any other or further

Claims, Environmental Claims (including all future response costs), debts, rights, causes of action, obligations, liabilities or Interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the entry of this Confirmation Order. In accordance with the foregoing, except as otherwise provided in the Plan or this Confirmation Order, this Confirmation Order shall be, and hereby is, deemed to constitute this Court's determination of discharge of all such claims against, and other debts, liabilities, obligations and rights of Interest Holders in, the Debtors and termination of all such Interests and other rights of equity security holders in the Debtors, Newco, the Reorganized Subsidiaries, Administrator Holdco, Administrator, and the Union Trust pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge shall be, and hereby is, deemed to void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a claim discharged or Interest terminated pursuant to the Plan or this Confirmation Order. In particular, the Committee and EOS Partners shall dismiss, with prejudice, all pending litigation and appeals involving the Debtors and any of the Release Parties, including, but not limited to, the Committee's appeals of the Final DIP Financing Order pending in the United States District Court for the Eastern District of Missouri, and EOS's pending litigation against MDP and Messrs. Wood and Hurd. The Committee's pending adversary proceeding against the Senior Secured Lenders is hereby dismissed with prejudice.

O36. As of the Confirmation Date, all non-Debtor entities and individuals that have held, currently hold or may hold a Claim or other debt, liability or other obligation that is discharged or an Interest or other right of an equity security holder

that is terminated, pursuant to the terms of the Plan or this Confirmation Order shall be, and hereby are, permanently enjoined from taking any of the following actions on account of any such discharged Claims, Environmental Claims (including all future response costs), debts, liabilities or other obligation or terminated Interests or rights, including, but not limited to the following: (i) commencing or continuing, in any manner or in any place, any action or other proceeding against the Debtors, Newco, the Reorganized Subsidiaries, Administrator Holdco, Administrator, the Union Trust or the Estates or their respective property, (ii) enforcing, attaching, collecting or recovering, in any manner or in any place, any judgment, award, decree or order against the Debtors, Newco or the Reorganized Subsidiaries, Administrator Holdco, Administrator, the Union Trust or the Estates or their respective property, (iii) creating, perfecting or enforcing any lien or encumbrance against the Debtors, Newco or the Reorganized Subsidiaries, Administrator Holdco, Administrator, the Union Trust or the Estates or their respective property; (iv) asserting a right of setoff, subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors, Newco, the Reorganized Subsidiaries, Administrator Holdco, Administrator, the Union Trust or the Estates or their respective property, and (v) commencing or continuing any action, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan and this Confirmation Order.

O37. All settlements and compromises of claims and causes of action of the Debtors against non-Debtor entities that are embodied in the Plan, which are approved herein as fair, equitable, reasonable and in the best interests of the Debtors and their respective estates and creditors, are effective and binding on all persons and entities who, prior to the filing of these Chapter 11 cases, may have had a claim or standing to assert such claims or causes of action, and no person or entity shall possess such claim or have standing to assert such claims or causes of action after the Effective Date.

O38. All non-Debtor entities shall be, and hereby are, permanently enjoined from commencing or continuing any action or other proceeding, in any manner or in any place, whether directly, derivatively or otherwise, on account of or respecting any claim, debt, right, cause of action or liability released or to be released pursuant to any provision, including Article X.D.1, of the Plan.

O39. On the Effective Date, all statutory committees, including the Committee, appointed in these Chapter 11 Cases, shall dissolve.

O40. Notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, this Court shall retain such jurisdiction over the Reorganization Cases as is legally permissible.

O41. Pursuant to Bankruptcy Rules 2002 and 3020, the Debtors shall serve a notice of the entry of this Confirmation Order, (the "Confirmation Notice"), on the current Master Service List, and the Master Notice List, no later than 10 days after the Confirmation Date. The form of Confirmation Notice shall first be submitted to the Court for its review and approval and shall provide conspicuous notice of all deadlines set forth herein including all deadlines to file claims or requests for payment.

O42. The Debtors shall publish the Confirmation Notice in the following publications no later than 15 days after the Confirmation Date:

1. The Wall Street Journal (National Edition); and

2. The St. Louis Post–Dispatch;

Such publication shall be sufficient notice to all holders of Interests as may be required by Bankruptcy Rule 2002.

O43. The Debtors shall serve copies of the Confirmation Order on each party identified on the current Master Service List, and on each party who filed an objection to the Plan, no later than 10 days after the entry of the Confirmation Order.

O44. The Record Date is approved.

O45. This Order shall be effective upon entry.

Therefore,

IT IS ORDERED that the Debtors' Amended and Restated Joint Plan of Reorganization, as modified, is CONFIRMED.